979 F.2d 661
 Ivron BUTLER, Frank A. Ledferd, David Corder, Hershel Marsh,
Appellants,
Doyle Kirkman, Jay M. French, Appellant,
v.
Denis DOWD, Appellee,
Daniel Henry, Phil Banks, Bruce Scott, Tim Sellars.
Ivron BUTLER, Frank A. Ledferd, David Corder, Hershel Marsh, Appellees,
Doyle Kirkman, Jay M. French, Appellee,
v.
Denis DOWD, Appellant,
Daniel Henry, Phil Banks, Bruce Scott, Tim Sellars.
Ivron BUTLER, Frank A. Ledferd, David Corder, Hershel Marsh,
Doyle Kirkman, Jay M. French, Appellees,
v.
Denis DOWD, Appellant,
Daniel Henry, Phil Banks, Bruce Scott, Tim Sellars.
 Nos. 90-2090, 90-2091 and 90-2782.
 United States Court of Appeals,
Eighth Circuit.
 Submitted July 21, 1992.
Decided Nov. 11, 1992.
 
 Michael J. Hoare, St. Louis, Mo., argued for Jay M. French, cross-appellee in 90-2090 and 90-2091.
 Erwin A. Switzer, Asst. Atty. Gen., St. Louis, Mo., argued (Joseph M. Hepworth, Steven A. Nieters, Special Asst. Attys. Gen., on the brief), for appellee/cross-appellant.
 Before RICHARD S. ARNOLD, Chief Judge, LAY and BRIGHT, Senior Circuit Judges, McMILLIAN, JOHN R. GIBSON, FAGG, BOWMAN, WOLLMAN, MAGILL, BEAM, LOKEN, HANSEN, and MORRIS S. ARNOLD, Circuit Judges, En Banc.
 MAGILL, Circuit Judge.
 
 
 1
 These prison inmates assert claims pursuant to 42 U.S.C. § 1983 against their custodians, the prison officials, for permitting them to be homosexually raped by other inmates in violation of their Eighth Amendment rights. Plaintiffs Frank Ledferd, David Corder, Hershel Marsh and Jay French appeal from the trial court's[1] denial of their motions for a new trial on damages and for declaratory and injunctive relief. Defendant Denis Dowd cross-appeals, claiming that the trial court erred in denying his motion for judgment notwithstanding the verdict and that the trial court abused its discretion in awarding plaintiffs' counsel almost $95,000 in attorneys' fees. Dowd also argues that a jury instruction erroneously set out the standard to determine whether there was an Eighth Amendment violation. We affirm.
 
 I.
 
 2
 The Farmington Correctional Center (FCC) is a near-maximum security facility located in Farmington, Missouri, that houses high-level security inmates serving long sentences for serious crimes. During 1988-89, all four plaintiffs were inmates of FCC.[2] Denis Dowd was the Superintendent at FCC from January 1, 1987, through March 30, 1990. On February 17, 1989, the four plaintiffs[3] filed a complaint under the Civil Rights Act, 42 U.S.C. § 1983, against Dowd and four of his staff members, alleging, inter alia, that they had been homosexually raped by other inmates and Dowd had failed to protect them. After counsel was appointed, plaintiffs filed an amended complaint against Dowd, three of his superiors and seven staff members. The complaint alleged six causes of action. Only one cause of action against one defendant, however, was submitted to the jury: the claim that Dowd violated plaintiffs' constitutional rights by recklessly or knowingly subjecting them to a pervasive risk of sexual assault.[4] The evidence presented by both parties focused on whether there was a pervasive risk of sexual assault at FCC, whether Dowd had acted with deliberate indifference or reckless disregard by subjecting the plaintiffs to such a risk and whether Dowd failed to protect the plaintiffs from assault.
 
 
 3
 The setting in which plaintiffs claim to have been sexually assaulted is as follows. Each 100-foot, two-story wing of the prison, containing sixty-five to seventy-square-foot, double-occupancy cells, is controlled from a central "bubble." From inside this bubble, the control officer monitors all activity in the hall and second-floor walkway of the wing. The officer has a view of the doors to the cells. In the door of each cell is a window about two-thirds the size of a legal pad. The window is covered with mesh. There are four microphones spaced twenty-five feet apart in the ceilings of each wing, and if a prisoner calls out from a cell the officer in the bubble will hear him. For example, if the prisoner calls out his cell number, the officer, who controls unlocking the cell doors from the bubble, can press a switch to unlock the cell. The officer cannot hear conversations that take place in a normal tone of voice. There are set periods of time called "open wing" when prisoners can move freely within the wing and visit each other if they wish. During the time period relevant to this suit, the rules applicable to open wing were that all cell doors were to be left open if an inmate who did not live there was visiting, but otherwise the doors had to be closed.[5] At 10:00 p.m., after evening open wing, the prisoners are locked into their cells for the night. This is called "lock down." The guards then conduct a custody count of each cell by switching the cell light on from the outside and looking to see if there are two prisoners in each cell. They do not look at the prisoners' faces, so they do not know if the inmates are in the correct cells.
 
 
 4
 Prisoners who are threatened within the general population of FCC can request protective custody. The policy for the entire Missouri prison system is that an inmate requesting protective custody must spend three days in administrative segregation pending a hearing before the Classification Committee[6] before being accorded protective custody. Administrative segregation is a closely-monitored area generally used to punish prisoners for rules violations. Usually the wait in administrative segregation is longer than three days because there is a waiting list for bed space in protective custody. The wait can be up to several weeks. There was testimony from several witnesses about the differences in conditions between administrative segregation and protective custody. For example, prisoners in administrative segregation receive very little of their personal property, no phone calls for the first thirty days, and have five minutes every other or every second day to either shower or clean their cell. The cells do not contain any furniture. Prisoners in protective custody, in contrast, get most of their personal property, some phone privileges, an hour a day out of the cell, and the cells contain furniture.
 
 
 5
 The evidence at trial indicated that the following happened to the plaintiffs after their arrival at FCC. Hershel Marsh, a nineteen-year-old, white, first-offender convicted of child abuse, arrived at FCC in July 1988. According to Marsh's testimony, prisoner William Stapleton, a black man, approached Marsh within 1 1/2 hours of his arrival at FCC and told him Stapleton would "fuck" him that night. Marsh was scared, but only told his cellmate about the encounter. That evening Stapleton came to Marsh's cell and talked to him for "several hours," but did not make any threats. The next day, Marsh met Stapleton in the gym and agreed to lift weights with him. That night, Marsh went to Stapleton's cell to discuss a weight-lifting schedule. Stapleton closed the cell door and raped him.[7] A week later, Stapleton told Marsh to come to his cell that evening. Marsh did so, and Stapleton raped him again. Marsh did not tell anyone about these attacks. In October or November, Stapleton told Marsh to request a cell change so that they could be cellmates. At that time they were living in different wings of the prison, so Marsh only saw Stapleton outside in the yard. Marsh asked for the cell change and his request was granted even though it was prison policy not to assign white and black inmates to the same cells. Although Marsh's caseworker discussed the request with him, Marsh claimed that Stapleton was present during the interview. The caseworker, Tom Gibson, testified that he talked to Marsh alone about the requested cell change and Marsh told him that there were no problems, that he and Stapleton were weight-lifting buddies and wished to live together. Marsh, on rebuttal, claimed that the one time he and Gibson discussed the cell change without Stapleton present, Gibson had called Marsh to his office on the loudspeaker and, therefore, Stapleton knew that he was talking to Gibson. Marsh testified that Stapleton raped him repeatedly after they became cellmates.
 
 
 6
 During this time, Stapleton also raped two of the other plaintiffs, Ledferd and Corder. In both instances, Stapleton told Marsh to switch cells with the victim for the night and Marsh did so. Marsh kept his face hidden when the guards passed so they could not tell that he was in the wrong cell.
 
 
 7
 Marsh did not report any of these incidents. In November, Marsh attempted to check into protective custody. Marsh testified that he told the prison officials his cellmate was forcing him to have sex. The check-in form filled out by prison officials recorded only that Stapleton was making Marsh pay his debts to other prisoners. Marsh was put in administrative segregation pending a hearing and available bed space in protective custody. Marsh testified that, shortly afterward, Stapleton, who worked in administrative segregation, contacted Marsh and threatened to harm him and his family if he maintained his allegations against Stapleton and stayed in administrative segregation. Stapleton provided Marsh with a typed letter stating that his allegations against Stapleton were not true, which Marsh signed. Although prisoners in administrative segregation are not allowed access to pens, paper or typewriters, no investigation into the origin of the letter took place. When his request for return to general population came before the Classification Committee, Marsh reaffirmed that his allegations against Stapleton were untrue. He then signed a statement saying that he was not in any danger and did not need protective custody. Marsh was returned to the same housing unit as Stapleton in general population,[8] where Stapleton again raped him. In January 1989, in preparation for this lawsuit, Marsh informed FCC officials about the sexual assaults and entered administrative segregation and then protective custody. After he informed FCC officials of the assaults, he was not assaulted again.
 
 
 8
 Frank Ledferd, an eighteen-year-old first-offender convicted of two counts of sodomy, entered FCC in October 1988. According to his testimony, approximately two weeks after his arrival at FCC he was sexually threatened by an inmate whose identity he did not know. He approached prisoner Rob Johnson, whom he had seen in the other inmate's company, because he wanted to discuss the threat and try to "straighten things out." Johnson closed the door of the cell and raped him. The next day Ledferd checked into protective custody and was placed in administrative segregation. He told the prison official who checked him in that he was being pressured for sex, but he did not tell the official about the assault. He claimed that the Classification Committee refused to assign him to protective custody because he couldn't name the individuals who were threatening him. Ledferd signed a statement saying that he was not in any danger and did not need protective custody. The Committee returned him to general population.
 
 
 9
 Ledferd then discussed the situation with his cellmate, Corder, who told him to go to Stapleton because Stapleton was "ok" and "not like all the rest." On Corder's advice, Ledferd went to Stapleton for help. Stapleton closed the door on the cell and told him he would be staying there that night. When the guards came by, Stapleton told him to lie facing the wall so the guards could not see his face and he did so. Stapleton then raped him. After that, about once every week, Stapleton would tell him to come to Stapleton's cell, where Stapleton would rape him. In January 1989, in preparation for this lawsuit, Ledferd informed FCC officials of the assaults. The prison staff checked him into administrative segregation pending bed space in protective custody, but Ledferd requested to be returned to general population two weeks later. In April, he entered protective custody at the insistence of the prison staff.
 
 
 10
 David Corder, a twenty-three-year-old first-offender convicted of burglary and sodomy, arrived at FCC in July 1988. According to his testimony, a few days after he arrived at FCC, he went to Stapleton's cell because Stapleton told him to go there. Stapleton told Corder that he was going to spend the night with Stapleton. Corder was there for several hours before lock down, but he did not call out or try to leave. Marsh, Stapleton's cellmate, was in and out several times getting things so that he could stay in Corder's cell for the night. When the guards came around later that evening, Stapleton told him to sit on a footlocker facing away from the door. He did this. Afterward, Stapleton raped him. A few days later, another inmate came to Corder's cell and threatened him. Corder hit the other inmate and locked the man in his cell. He then found a guard and told the guard about the incident. Corder was put into administrative segregation for punishment for thirteen days. While there, he requested protective custody. Stapleton threatened him, however, and made him sign a statement that he and the inmate who threatened Corder in his cell were not enemies and he did not need protective custody. Corder was then returned to general population. In January 1989, in preparation for this lawsuit, he informed FCC officials of the sexual assault. Corder was not sexually assaulted after that time. He has refused to enter protective custody, however, because he has to go through administrative segregation first.
 
 
 11
 Jay French, twenty-one and convicted of burglary, arrived at FCC in December 1988. French had been in jail before, but not in prison. According to French's testimony, when he arrived at FCC he bought a television from prisoner George Anderson, contrary to prison rules. Although he paid for the television, Anderson claimed that he had not and told him he would have to pay "homosexually." French attempted to check into protective custody, complaining that he was being pressured for sex, and was put in administrative segregation pending a hearing and available bed space in protective custody. He requested to be returned to general population, however, because he learned that Anderson was going to follow him into protective custody and he was afraid Anderson would kill him.[9] Soon after his return to general population, Anderson's "associate," Darryl Saddler, raped French in French's cell. Later, Anderson approached French. When French started to cry, Anderson only required French to touch his penis. A few days later, however, Anderson told French to come to his cell. French went, and Anderson forced him to perform oral sex on Anderson. In January 1989, in preparation for this lawsuit, French informed FCC officials of the assaults. He has not been assaulted since that time. During his testimony, French stated that he did not think Dowd intended to hurt him and that Dowd probably didn't know about French's specific situation until French had made his statement. He believes, however, that Dowd must have known about the "general situation."
 
 
 12
 Plaintiffs introduced several pieces of evidence intended to show that Dowd must have known about the threat of sexual assault at FCC. Plaintiffs contended that there is a certain profile that can be used to identify prisoners who are likely to be victimized by other prisoners and that they fit this profile. They also argued that Dowd knew this, and that he either knowingly or recklessly failed to take steps to protect vulnerable prisoners from others whose records show that they are aggressive and violent.[10] Dr. Ronald Sable, plaintiffs' expert witness, testified that younger inmates, who are smaller and slightly built, who are first offenders or naive with respect to the correctional system, and who have generally passive personalities, tend to be victimized. Dr. Sable testified that he believed plaintiffs fit this description. He stated that, given the record of the men who assaulted plaintiffs, the administration should have known that this was a very real danger. Plaintiffs introduced into evidence an affidavit signed by Dowd to show that Dowd knew the plaintiffs were at risk. The affidavit read, in relevant part:
 
 
 13
 Plaintiffs in this action are typical of the type of inmate who normally receives such intimidation from other inmates. Plaintiffs exhibit generally passive personalities and are unable to stand up to these inmates threatening them. It is likely that plaintiffs will be subject to such treatment by other inmates wherever they go.
 
 
 14
 Aff. of Denis D. Dowd, Appellant's App. at 61.
 
 
 15
 Richard Jones, an employee of FCC, testified that he had read approximately 100 reports of sexual assaults at FCC over a three-year period beginning in 1987. The evidence showed, however, that Dowd had never referred a case of sexual assault for prosecution and had referred only a very few cases for investigation. Plaintiffs' assaults were not investigated after plaintiffs reported them in January 1989. Dr. Sable testified that, according to documents he reviewed, there were fourteen reported rapes within an eighteen-month period at FCC, and he believed the incidence of unreported rapes to be much higher. Doyle Kirkman, a prisoner at FCC, testified that he had overheard conversations in the presence of guards where some inmates demanded sexual favors, money, and clothing from other inmates and discussed sexual activity on the prior night with their "wives." Dowd was not present during these conversations, but he testified that his staff was instructed to report any such major violations to him.
 
 
 16
 FCC employees testified that they had had no training or instruction about how to handle sexual abuse or assault problems between prisoners. The orientation program for new prisoners does not contain a component relating to sexual abuse of prisoners by other prisoners; it neither warns prisoners of the occurrence of such abuse nor apprises them that such abuse will be punished. Plaintiffs claimed that the orientation program also did not inform them about how to obtain protective custody. They testified that they did not know how to request protective custody until other inmates told them.
 
 
 17
 In addition, plaintiffs introduced evidence that at the time relevant to this suit, prisoners were assigned to cells randomly and there was no effort to separate passive inmates from aggressive inmates. Dr. Sable testified that he believed it was reckless to randomly assign people to cells.
 
 
 18
 Dr. Sable also testified that requiring prisoners to spend time in administrative segregation before they are assigned to protective custody is a heavy burden on inmates seeking protective custody. FCC employee Jones estimated that more than one inmate per month decided not to go into protective custody because they had to go through administrative segregation.
 
 
 19
 Denis Dowd testified that he had never read in the professional literature about specific characteristics that indicated some inmates are more prone to sexual assault than others. He stated that the affidavit he signed referred to verbal intimidation and was in response to plaintiffs' demand for transfers to another prison, not their allegations of sexual assault.[11] Dowd said that he believes FCC has fewer rapes than other prisons, and he does not know what further steps the prison could take to stop these occurrences. Dowd said that he has never referred a reported prison rape for prosecution because he has never had a reported case that included physical evidence or an eyewitness. He did not account for the fact that there was no investigation of plaintiffs' rapes after they were reported in January 1989. He explained that he approved the return of prisoners to the general population after they claimed they were being pressured for sex if the Committee recommended that course of action. Despite the Committee review process, prisoners who insist they need protective custody are not returned to general population.[12] If an inmate insists that he wants to return to general population, however, and signs a statement saying he is not in any danger, there is very little the prison staff can do to help that prisoner. He said that the inmates have to report incidences before the prison staff can help them, and these plaintiffs did not report that they had been assaulted until January 1989. He emphasized that none of them had been assaulted after they had informed the FCC staff of the problem.
 
 
 20
 Dowd testified that it is not prison policy to deny an inmate protective custody because he will not or cannot name his enemies. Dowd also testified that Stapleton could not have gotten close enough to either Marsh's or Corder's cells in administrative segregation to be able to intimidate them.
 
 
 21
 In response to Dr. Sable's testimony about assigning prisoners to cells at random, Dowd pointed out that none of the plaintiffs except Marsh were assaulted by their assigned cellmate, and Marsh had requested a cell change to live with his attacker.
 
 
 22
 Several prison officials testified that it was standard procedure to inform incoming inmates about the availability and procedures for obtaining protective custody. The evidence showed that all four plaintiffs signed forms when they arrived at FCC saying they did not need protective custody.
 
 
 23
 After a four-day trial, the jury found in favor of plaintiffs, but awarded them only $1 each in nominal damages. Plaintiffs moved for a new trial on damages and requested that the district court grant them injunctive and declaratory relief. Dowd moved for judgment notwithstanding the verdict (j.n.o.v.). The district court denied all post-trial motions and awarded plaintiffs attorneys' fees in the amount of $94,680, pursuant to 42 U.S.C. § 1988.
 
 
 24
 Plaintiffs appealed, arguing that the district court erred in denying them a new trial on the issue of damages and in denying their requests for declaratory and injunctive relief. Dowd cross-appealed, arguing that the district court erred in denying his motion for j.n.o.v. Dowd also argued that the district court abused its discretion when it awarded plaintiffs attorneys' fees because it failed to consider the plaintiffs' lack of overall success. A panel of this court heard argument, and held that plaintiffs were entitled to a new trial solely on the issue of damages and a further hearing on injunctive relief. The panel left the question of attorneys' fees undecided pending the new trial on damages. It affirmed the trial court on all other issues. Dowd moved for rehearing and rehearing en banc. We granted the motion for rehearing en banc and vacated the panel opinion. We now affirm the trial court on all issues.
 
 II.
 A. New Trial on Damages
 
 25
 Plaintiffs claim that the jury's award of nominal damages was inadequate as a matter of law. Specifically, plaintiffs argue that the evidence shows that they were raped, and that they suffered physical and emotional distress as a result. Indeed, this court has recognized that rape is devastating. Vosburg v. Solem, 845 F.2d 763, 768 (8th Cir.), cert. denied, 488 U.S. 928, 109 S.Ct. 313, 102 L.Ed.2d 332 (1988). Only when a jury's award is so inadequate as to constitute "plain injustice" or a "shocking" result, however, may we overturn it. Solomon Dehydrating Co. v. Guyton, 294 F.2d 439, 447-48 (8th Cir.), cert. denied, 368 U.S. 929, 82 S.Ct. 366, 7 L.Ed.2d 192 (1961). When making this determination, "a comparison of verdicts in other cases is of limited value as each case must be evaluated according to the evidence peculiar to that case." Century "21" Shows v. Owens, 400 F.2d 603, 611 (8th Cir.1968); Perry v. Bertsch, 441 F.2d 939, 944 (8th Cir.1971).
 
 
 26
 Plaintiffs contend that the only explanation for an award of nominal damages to all four plaintiffs is the jury's bias against their status as prisoners; thus, the award constitutes "plain injustice." We disagree. The plaintiffs' status as prisoners is not the only explanation for the jury's award. The jury rationally could have concluded that many of the plaintiffs' injuries would have occurred even if the defendant's conduct had met constitutional standards. Moreover, plaintiffs failed to produce at trial objective medical evidence supporting their physical injuries or detailing the extent of their emotional injuries. The amount of damages, therefore, depended largely upon the credibility of the plaintiffs' testimony concerning their injuries. We find that based upon these factors, the jury's decision to award only nominal damages was not "plain injustice" or so "shocking" as to require a new trial on the issue of damages.
 
 
 27
 The jury could have awarded nominal damages because it concluded that the plaintiffs' actions, not those of the defendant, were the cause in fact of most of the plaintiffs' injuries. In order to establish a violation of constitutional rights under § 1983, the plaintiff must prove that the defendant's unconstitutional action was the "cause in fact" of the plaintiff's injury. Carey v. Piphus, 435 U.S. 247, 263, 98 S.Ct. 1042, 1052, 55 L.Ed.2d 252 (1978); Cowans v. Wyrick, 862 F.2d 697, 703 (8th Cir.1988) (McMillian, J., concurring). Conduct is the cause in fact of a particular result if the result would not have occurred but for the conduct. Similarly, if the result would have occurred without the conduct complained of, such conduct cannot be a cause in fact of that particular result. Carey, 435 U.S. at 263, 98 S.Ct. at 1052; see W. Page Keeton, Prosser and Keeton on the Law of Torts, § 41, at 264 (5th Ed.1984). In the context of this case, plaintiffs have to prove that the defendant's unconstitutional conduct was the cause in fact of the sexual assaults they suffered. If, however, an assault would have occurred even if the defendant had not been "deliberately indifferent to a pervasive risk" of sexual assault, the defendant cannot be liable for that assault.
 
 
 28
 The jury did find that the defendant's unconstitutional actions were the cause in fact of at least one of the attacks on each plaintiff. The jury could, however, have found the defendant's unconstitutional actions were not the cause in fact of many of the plaintiffs' injuries and still have returned a verdict for plaintiffs. The evidence presented to the jury detailed numerous assaults against each plaintiff. The jury did not, however, have to believe that the defendant's actions caused each attack in order for it to find for each plaintiff. Each attack was a separate event, and the relevant causal inquiry is whether that attack would have been prevented if the defendant's actions had met constitutional standards.
 
 
 29
 Furthermore, the jury charge would allow the jury to so find. The jury specifically was instructed that it could find the defendant liable to each plaintiff if it found one incident of assault for which the defendant was responsible. Tr., Vol. V at 47. Moreover, the jury was charged that it could award damages only for those injuries that were a direct result of the defendant's actions. Tr., Vol. V at 48.
 
 
 30
 Because the jury returned a general verdict, we cannot tell which attacks or injuries the jury concluded were caused by the defendant's unconstitutional actions, or whether the jury believed that certain of the attacks would have occurred anyway.[13] We also cannot tell what evidence the jury found necessary to conclude that the defendant breached his constitutional duty. Given this uncertainty, the jury could likely have believed that the plaintiffs' actions, and not the defendant's unconstitutional conduct, caused many of their injuries.
 
 
 31
 Ample evidence in the record supports such a conclusion. First, in many of the assaults complained of, the plaintiff went to the cell of his attacker. The assailant did not lead him there. Instead, on several occasions a significant period of time elapsed before the plaintiff walked by himself to his assailant's cell. The record demonstrates that on these occasions, the plaintiff failed to notify prison officials of his situation. Plaintiffs declined to pursue their requests for protective custody and returned to the general population during the period in which they were being assaulted. Plaintiff Marsh actually assisted in the rapes of two of the other plaintiffs by switching cells with them and not showing himself to the guards. Three of the plaintiffs failed to reveal themselves to guards when they were in the wrong cell; each subsequently was assaulted. Moreover, one of the plaintiffs' main contentions is that prison officials' failure to classify them as "passive" and to segregate them from violent prisoners led to their assaults. They claim that the defendant's policy of assigning inmates to cells at random put them at a risk of harm. The record demonstrates, however, that none of the assaults occurred in the plaintiffs' own cells at the hands of their randomly assigned cellmates. The jury could have concluded, based on this evidence, that many of the attacks would have occurred even if the defendant's conduct met constitutional standards.
 
 
 32
 The record further reflects that once plaintiffs did inform prison officials that they had been sexually assaulted (as opposed to simply being threatened), they were placed in administrative segregation or protective custody. No plaintiff ever was sexually assaulted while in administrative segregation or protective custody. From this evidence, the jury may have concluded that although the defendant's actions caused the first assault as to each, the plaintiffs' failure to seek protection was the cause in fact of all further assaults they faced.
 
 
 33
 As additional support for the nominal damages award, the jury could have concluded that plaintiffs failed to prove their damages for the injuries it did find to be caused by the defendant's wrongful conduct. In addition to holding that a jury award of damages must be "shocking" to be inadequate, we also believe that credibility questions concerning damages should be decided at the district court level. We have stated that:
 
 
 34
 [I]nadequacy or excessiveness of a verdict is basically, and should be, a matter for the trial court which has had the benefit of hearing the testimony and of observing the demeanor of the witnesses and which knows the community and its standards; that this is a responsibility which, for better working of the judicial process and for other seemingly obvious reasons, is best placed upon its shoulders....
 
 
 35
 Taken Alive v. Litzau, 551 F.2d 196, 198 (8th Cir.1977) (citing Solomon Dehydrating Co. v. Guyton, 294 F.2d 439, 447-48 (8th Cir.), cert. denied, 368 U.S. 929, 82 S.Ct. 366, 7 L.Ed.2d 192 (1961)). The court went on to state:
 
 
 36
 An appellate court should be extremely hesitant to overturn a jury verdict which includes damages for pain and suffering.... There is no precise or exact measuring stick for calculating general damages for pain and suffering. Although the jury should not pick a figure out of the air, exact compensation for pain and suffering is impossible.
 
 
 37
 Id.
 
 
 38
 These dictates apply with particular force to the present case. In order to recover compensatory damages in a § 1983 action, the plaintiff must prove them. See Carey, 435 U.S. at 263, 98 S.Ct. at 1052; Cowans, 862 F.2d at 700. In this case, nearly all of the evidence of the plaintiffs' damages consists of their own testimony. The issue of damages thus depends upon the credibility of witnesses, a matter particularly within the province of the jury.
 
 
 39
 We first note that an extensive review of the record demonstrates that none of the plaintiffs provided medical testimony regarding the extent of their physical injuries. Similarly, medical proof of the plaintiffs' emotional distress was limited to the introduction of one-page medical services statements in which a prison psychologist (not a medical doctor) stated merely that two of the plaintiffs, Marsh and Ledferd, suffered from "post traumatic stress disorder," and that he had prescribed sleeping pills for them. This psychologist did not testify. Plaintiffs provided no testimony explaining what "post traumatic stress disorder" is or what its effects are. Moreover, the evidence regarding Corder's and French's injuries is even more sparse. They provided no medical evidence whatsoever supporting either their physical or emotional injuries.
 
 
 40
 Plaintiffs' medical expert, Dr. Ronald Sable, likewise provided little support concerning the extent of the plaintiffs' damages. He testified that he had not examined any of the plaintiffs. Thus, he could not state whether these plaintiffs were in fact damaged by their experience. Moreover, his testimony concerning rape trauma syndrome does not even give the jury enough information to conclude whether plaintiffs suffered from its effects.[14] Thus, after hearing the plaintiffs' sole medical expert at trial, the jury had no basis from which to conclude that plaintiffs were damaged. The record is bereft of any medical testimony either by hypothetical or otherwise based upon reasonable medical probability.
 
 
 41
 When medical testimony is absent, proof of the nature and extent of a plaintiff's injuries necessarily depends upon the credibility of the plaintiff's testimony. In addition to the medical testimony recited above, the jury heard the following concerning the plaintiffs' injuries:
 
 
 42
 Marsh stated that he suffered from ulcers and lack of sleep following repeated assaults by Stapleton. III Trial Transcript at 182 [hereinafter Tr.]. A prison psychiatrist prescribed Marsh sleeping pills. III Tr. at 196. Inmate Ivron Butler testified that he observed Marsh throwing up several times after being raped. II Tr. at 133. Ledferd described suffering from anal bleeding for a week and a half after Stapleton raped him, and stated that he suffers from torment and depression continuously. III Tr. at 124-25. Corder stated that he was unable to urinate or defecate, and lost his appetite after Stapleton raped him; he also testified that he suffered headaches after Stapleton hit him on the head during an assault. III Tr. at 194. French stated that Anderson beat him during an assault. III Tr. at 157. Inmate Doyle Kirkman stated that French broke down in tears while describing his ordeal. II Tr. at 161.
 
 
 43
 Dissenting op. of Bright, J., infra at 682. Given the lack of medical testimony, the jury's determination of the extent of the plaintiffs' injuries must have depended upon their evaluation of this testimony.
 
 
 44
 There is considerable evidence in the record from which the jury could have concluded that the plaintiffs' testimony concerning their injuries was not credible and could have disbelieved the extent of their injuries. Despite the plaintiffs' claims regarding the extent of their mental torment and suffering, all failed promptly to report the incidents. Marsh even asked to room with his assailant after being attacked. All of the plaintiffs left administrative segregation and returned to the general population. When they did so, each signed a statement providing that "I do not feel my safety to be threatened or my life to be in danger. Therefore, no, I do not need protective custody."[15] Moreover, three of the plaintiffs stated that they did not want to check into administrative segregation because they would lose radio and television privileges and would have limited spending money.[16] From this evidence, the jury reasonably could have disbelieved the plaintiffs' testimony concerning the injuries received from those attacks it found to be caused by the defendant. Because the proof of the plaintiffs' injuries is limited almost solely to their own testimony, and thus the issue of damages limited almost exclusively to that of credibility, this court should not upset the determination of the jury and the trial court, which were in a much better position to determine the credibility of witnesses.
 
 
 45
 After concluding that the jury could have disbelieved the plaintiffs' testimony regarding the extent of their injuries, the award in this case is not aberrant. This court has approved nominal damages in other cases in which the plaintiffs suffered apparently quantifiable harm. See Warren v. Fanning, 950 F.2d 1370 (8th Cir.1991) (nominal damage award upheld where denial of proper medical treatment resulted in surgical removal of toenails, surgical removal of rod in leg, and surgery on heel), petition for cert. filed, --- U.S. ----, 113 S.Ct. 111, 121 L.Ed.2d 68 (1992); Cowans v. Wyrick, 862 F.2d 697 (8th Cir.1988) (nominal damage award appropriate when guard slammed door on inmate's hand resulting in pain, swelling and bruising if jury unable to place monetary value on harm; jury free to disbelieve the extent of swelling or other compensable injury); Williams v. Mensey, 785 F.2d 631, 639 (8th Cir.1986) (nominal damages not inadequate as a matter of law when the plaintiff complained that he had been punched in the head with enough force to hit the wall and claimed to suffer headaches, back pain, and blurred vision as a result); cf. Haley v. Wyrick, 740 F.2d 12 (8th Cir.1984) (nominal damage award to plaintiff stabbed thirty-two times by five other prisoners not so inadequate to require its reconsideration in the absence of a motion for a new trial). Although we do not necessarily equate the pain and suffering of a rape victim with the injuries suffered by plaintiffs in the foregoing cases, given that the jury could reasonably refuse to believe the plaintiffs' testimony regarding the extent of their injuries, we do not find the present award "shocking" or a "plain injustice."
 
 B. Equitable Relief[17]
 1. Declaratory Relief
 
 46
 Plaintiffs claim that the district court erred by denying their motion for declaratory relief. They argue that, because the jury found for them on the liability issue, they are entitled to declaratory relief.
 
 
 47
 In order for the court to have jurisdiction to grant declaratory relief, there must be an "actual controversy" between the parties. Caldwell v. Gurley Ref. Co., 755 F.2d 645, 648 (8th Cir.1985). The test is whether there is a substantial controversy between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. Id. at 649.
 
 
 48
 In this case, there was no actual controversy left to resolve through declaratory relief when that issue was submitted to the district court. The plaintiffs' only requested declaratory relief mirrored what the jury was told it must find in order to hold the defendant liable.[18] The jury verdict, therefore, amounts to an implicit declaration of the same things that plaintiffs are requesting in their motion for declaratory relief. Plaintiffs admitted this in oral argument.[19] Once the jury's verdict was reached, declaratory relief could not change or clarify any legal relationship between plaintiffs and defendant. See International Wood Processors v. Power Dry, Inc., 593 F.Supp. 710, 736 n. 15 (D.S.C.1984), aff'd, 792 F.2d 416 (4th Cir.1986) ("[G]ranting declaratory relief would serve no useful purpose at this stage because the legal obligations of the parties have been clarified by the jury's resolution of the legal claims."). Therefore, the issue is moot and neither this court nor the district court has jurisdiction to grant declaratory relief.
 
 
 49
 For the foregoing reasons, we affirm the district court's denial of plaintiffs' motion for declaratory relief.
 
 2. Injunctive Relief
 
 50
 Corder claims that the district court erred in denying his motion for injunctive relief.[20] In order for him to obtain injunctive relief, he must show "some substantial likelihood that past conduct alleged to be illegal will recur." Sterling v. Calvin, 874 F.2d 571, 572 (8th Cir.1989). A showing that unconstitutional practices have taken place in the past is not enough. He must show that such practices are likely to affect him in the future. See id. Corder has not made any such showing. Although he claims that he is still subject to threats from fellow inmates, Appellants' App., Tab 7 p. 51 p 46, Pls.' First Amended Compl., he does not claim that he is still subject to sexual assault. The testimony was that none of the plaintiffs has been sexually assaulted since January 1, 1989. Trial Tr., Vol. I pp. 25 et seq.; Appellants' App., Tab 7, Pls.' First Amended Compl. In fact, the evidence demonstrates that Corder feels secure enough from assault that he filed a grievance about a policy change that was apparently designed to prevent such assaults from occurring.[21] Corder thus has not shown a substantial likelihood that the unconstitutional practices he complained about at trial will recur or affect him in the future. The injunctive relief Corder requests, therefore, will only benefit other inmates, particularly new inmates. Injunctive relief, however, must be carefully tailored to remedy the alleged specific harm to the parties involved. See United States v. Articles of Drug, 825 F.2d 1238, 1247-48 (8th Cir.1987); see also Orantes-Hernandez v. Thornburgh, 919 F.2d 549 (9th Cir.1990); Brown v. Trustees of Boston Univ., 891 F.2d 337 (1st Cir.1989), cert. denied, 496 U.S. 937, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990) (classwide relief appropriate only where there is a properly certified class). This is not a class action. Corder, therefore, is not entitled to the injunctive relief he requests.
 
 
 51
 In addition, much of the injunctive relief Corder requests in this case is beyond the power of the superintendent of an individual institution to grant. He requests, inter alia, a transfer to the Missouri Eastern Correctional Center,[22] orientation programs on sexual assaults for new inmates, a different system to classify and segregate some inmates from others, and no temporary stay in administrative segregation before entering protective custody. All these aspects of institutional life are governed by a centralized authority, the Missouri Department of Corrections, and the superintendent has no power to change centralized decisions. Appellee--Cross-Appellant's Supplemental App., Tab 3 at 14-16, Aff. of George A. Lombardi, Director of Adult Institutions for the Missouri Department of Corrections and Human Resources.
 
 
 52
 For the foregoing reasons, we affirm the district court's denial of the motion for injunctive relief.
 
 
 53
 C. Denial of J.N.O.V.
 
 
 54
 Dowd argues that the district court erred when it denied his motion for j.n.o.v. because plaintiffs failed to prove that they faced a pervasive risk of sexual assault at FCC. He contends that plaintiffs failed to establish that sexual assaults occurred at FCC with such frequency as to reasonably apprise FCC officials of the risk of attack. The jury found that Dowd violated plaintiffs' Eighth Amendment right to be free from cruel and unusual punishment by knowingly or recklessly subjecting plaintiffs to a pervasive risk of sexual assault. See Jury Instruction 11, supra; see also Bailey v. Wood, 909 F.2d 1197, 1199 (8th Cir.1990); Vosburg, 845 F.2d at 765; Martin v. White, 742 F.2d 469, 474 (8th Cir.1984); cf. Wilson v. Seiter, --- U.S. ----, ---- - ----, 111 S.Ct. 2321, 2326-27, 115 L.Ed.2d 271 (1991).
 
 
 55
 In reviewing the district court's denial of Dowd's motion for j.n.o.v., we apply the same standard as the district court. Morgan v. Arkansas Gazette, 897 F.2d 945, 948 (8th Cir.1990) (citing Cleverly v. Western Elec. Co., 594 F.2d 638, 641 (8th Cir.1979) (per curiam)). Therefore, we must consider the evidence in the light most favorable to the prevailing party (the plaintiffs), assume that the jury resolved all conflicts in the evidence in favor of the plaintiffs, assume as proved all facts that the plaintiffs' evidence tends to prove, give the plaintiffs the benefit of all favorable inferences that can reasonably be drawn from the facts proved, and affirm the denial of the motion if reasonable persons could differ about the conclusions to be drawn from it. Id. Generally, "only the evidence favoring the nonmoving party (usually, as here, the plaintiff) should be considered." Id. (quoting Dace v. ACF Indus., 722 F.2d 374, 376 (8th Cir.1983)).
 
 
 56
 When we consider the evidence presented at trial in this case under this stringent standard of review, we find that there was sufficient evidence to support the jury's finding that Dowd subjected plaintiffs to a pervasive risk of sexual assault in violation of their Eighth Amendment rights. Plaintiffs presented evidence that there were at least 100 sexual assaults reported at FCC during a three-year period. During that same time frame, however, there were almost no sexual assaults assigned to the prison investigator for investigation, and Dowd never referred even one sexual assault for prosecution. There was no warning to prisoners about the risk of sexual assault. The prison personnel had received no training or instructions about how to handle sexual assaults or how to prevent them. Prisoners were assigned to general population at random, with no segregation based on their vulnerability to assault. Dr. Sable, plaintiffs' expert, testified that this practice was reckless conduct. Plaintiffs introduced an affidavit at least implying that Dowd knew plaintiffs, and others like them, were vulnerable. Protective custody was not readily available to inmates because they were required to spend extended periods of time in administrative segregation before being admitted to protective custody. Dr. Sable testified that this is a significant barrier to inmates requiring protection. Given this evidence presented by plaintiffs, we cannot say the district court erred by denying Dowd's motion for j.n.o.v.
 
 
 57
 Dowd also claims that he was entitled to j.n.o.v. because as a state actor he was protected by qualified immunity. In Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court held that defendants will be protected by qualified immunity in § 1983 suits only if their actions did not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." Id. at 818, 102 S.Ct. at 2738. This court has clearly held that prisoners have a constitutional right to be free of sexual attacks by other inmates and that a prison official is liable if they are deliberately indifferent or act with reckless disregard of that right. Vosburg, 845 F.2d at 765-66; Martin, 742 F.2d at 474. Because this is a clearly established constitutional right about which Dowd either knew or should have known, Dowd was not entitled to qualified immunity in this case. The district court did not err in denying his motion for j.n.o.v. on this basis.
 
 D. Attorneys' Fees
 
 58
 Dowd claims that the district court abused its discretion in awarding plaintiffs' counsel $94,680 in attorneys' fees. Dowd argues that because plaintiffs failed on the issue of damages, they achieved limited success. Therefore, the district court should reduce the award to reflect the limited success achieved by plaintiffs. Dowd also argues that the district court failed to consider that one of the two plaintiffs' attorneys was inexperienced and attended all depositions and proceedings without doing anything, thereby unnecessarily increasing the hours plaintiffs' attorneys spent on this case.[23]
 
 
 59
 A district court has a "special understanding" of the complexity of a case, and therefore is best equipped to determine the reasonableness of the hours expended by counsel. Catlett v. Missouri Highway & Transp. Comm'n, 828 F.2d 1260, 1270 (8th Cir.1987), cert. denied, 485 U.S. 1021, 108 S.Ct. 1574, 99 L.Ed.2d 889 (1988) (citing Moore v. City of Des Moines, 766 F.2d 343, 345-46 (8th Cir.1985), cert. denied, 474 U.S. 1060, 106 S.Ct. 805, 88 L.Ed.2d 781 (1986)). We will overturn a district court's award of attorneys' fees only if the district court abused its discretion. Id.
 
 
 60
 In this case, the district court awarded plaintiffs $94,680 in attorneys' fees based on 946.9 hours expended at a reasonable hourly rate of $100.[24] When determining the amount of attorney's fees, the district court must focus on the "significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." Hensley v. Eckerhart, 461 U.S. 424, 435, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983). The Supreme Court has also stated that "[t]he amount of damages a plaintiff recovers is certainly relevant to the amount of attorney's fees to be awarded under § 1988. It is, however, only one of many factors that a court should consider in calculating an award of attorney's fees. We reject the proposition that fee awards under § 1988 should necessarily be proportionate to the amount of damages a civil rights plaintiff actually recovers." City of Riverside v. Rivera, 477 U.S. 561, 574, 106 S.Ct. 2686, 2694, 91 L.Ed.2d 466 (1986) (plurality) (citations omitted). We believe that the district court properly followed these mandates. First, the magistrate judge specifically considered the level of success in calculating his award. The magistrate judge stated that "[a]lthough at first blush such an award might seem excessive in light of the nominal damages awarded, the measure of success in Civil Rights litigation of this type is not limited to the monetary damage award. There is inherent value in a determination that ones [sic] constitutional rights have been violated. Accordingly, this court finds that plaintiffs' attorneys are entitled to fees in the amount of $94,680." Corder v. Dowd, No. 89-276C(6), slip op. at 4 (E.D.Mo. Sept. 19, 1990). The record reflects that the litigation did serve the interest of prisoners other than the plaintiffs, as the defendant subsequently instituted some of the safety measures requested by the plaintiffs.[25] Cf. Rivera, 477 U.S. at 585-86, 106 S.Ct. at 2699-2700 (Powell, J., concurring).
 
 
 61
 The court also considered several other factors, including the complex nature of the litigation, the quality of the work, the zealous manner in which plaintiffs' attorneys pursued their cause, and the effect this litigation had on the attorneys' small firm. Id. at 3. In addition, the court awarded attorneys' fees to counsel based on a flat hourly fee of $100 even though plaintiffs' lead counsel presented substantial evidence supporting a fee of $175 an hour for his time. After reviewing the district court's calculations and the evidence submitted by plaintiffs, we cannot find that the district court abused its discretion in this case.E. Instruction
 
 
 62
 Dowd argues that the instruction on the standard to determine whether he violated the Eighth Amendment was erroneous. The instruction read as follows:
 
 
 63
 Prison officials may be liable for violation of a prisoner's civil rights, where they are deliberately indifferent to a prisoner's constitutional right to be free from sexual attacks by other inmates, if they actually intend to deprive them of that right, or if they act with careless disregard of this right. Reckless disregard of the prisoner's right to be free from sexual attacks by other inmates may be shown by the existence of a pervasive risk of harm to inmates from other prisoners and failure of prison officials reasonably to respond to that risk.
 
 
 64
 We have clearly held that a prison official may be liable for a violation of a prisoner's right to be free from sexual attacks by other inmates if that official is deliberately indifferent to that right or acts with reckless disregard for the right. Vosburg, 845 F.2d at 765-66; Martin, 742 F.2d at 474. Dowd argues that Wilson, --- U.S. at ---- - ----, 111 S.Ct. at 2326-27, has changed the law and he should not have been subject to liability for reckless disregard. Dowd contends that he is therefore entitled to a new trial on liability. Dowd argues this issue for the first time on appeal. He did not object to the instruction at the time of trial. We do not address this issue because it has not been preserved and, therefore, is not before us. See Diamonds Plus, Inc. v. Kolber, 960 F.2d 765, 768 (8th Cir.1992); United States v. Standefer, 948 F.2d 426, 430 (8th Cir.1991).
 
 III.
 
 65
 For the foregoing reasons, we affirm the district court on all counts.
 
 
 66
 BEAM, Circuit Judge, concurring specially.
 
 
 67
 I agree with much that is said in Judge Bright's dissent and would agree to reverse and remand this matter for a new trial on all issues--liability, causation, and damages. I will not agree, however, under the circumstances of this case, to treat one party unfairly in an attempt to treat the other fairly, especially when justice can be done for both. Accordingly, with reluctance, I concur in the result reached in the opinion prepared by Judge Magill.
 
 
 68
 First, I disagree with both opinions that the jury verdict stands for the proposition that each plaintiff was raped at least once. This conclusion is speculative and unsupported by the actions taken by the jury.
 
 
 69
 The plaintiffs contend that a jury verdict in favor of each plaintiff proves at least one rape because of the following instructions:
 
 
 70
 If you find that any one or more of the Plaintiffs consented or was not forcibly compelled to engage in any alleged sexual conduct with other inmates, then your verdict must be for the Defendant.
 
 
 71
 ....
 
 
 72
 Your verdict must be for any of the Plaintiffs and against the Defendant, Denis Dowd, if you find that: One, the Plaintiff was subjected to one or more sexual attacks by prisoners in Farmington Correctional Center. Two, Defendant knew or should have known the prisoners, such as Plaintiff, were subject to a pervasive risk of sexual attack. Three, Defendant failed to respond reasonably to the risk of such attacks. Four, the Defendant's conduct was a proximate cause of the Plaintiff's injury. And five, the Plaintiff was injured.
 
 
 73
 Appellants' Reply and Answer Brief at 7 & n. 2 (emphasis added) (citations omitted).
 
 
 74
 The record contains much evidence concerning rape, threatened rape, and physical and mental abuse of a sexual and nonsexual nature short of rape. All of this activity could properly have been understood by the jury to constitute "sexual conduct," "sexual attacks," and "sexual assault,"[1] the various terms used by the trial court in its instructions. Further, in accordance with our opinion in Cowans v. Wyrick, 862 F.2d 697, 700 (8th Cir.1988) the jury was told "injury or damage[s] ... can include ... physical pain and discomfort, and any emotional and mental harm ... suffered, including fear, humiliation and mental anguish." Trial Transcript Vol. V at 47-48.
 
 
 75
 Thus, while I agree, as stated in Cowans, that harm of some kind is a relevant element in a determination that a constitutional violation has occurred, a finding of liability under the verdict director instruction given in this case does not necessarily establish that an actual rape occurred involving each plaintiff, or any plaintiff for that matter.
 
 
 76
 Second, and of perhaps more importance, the very nature of an Eighth Amendment claim makes partial remand for consideration of only damages improper, especially under the circumstances of this particular dispute. It is elemental that plaintiffs must have carried the burden of proof of the issues of liability, causation, and damages. Because, as discussed, proof of liability in an Eighth Amendment context requires a finding of some element of harm, all issues--liability, causation, and damages--are inextricably intertwined. Thus, a remand to consider damages alone is constitutionally suspect. The practice of retrial on one issue is constitutional, but only if the issue remanded is "so distinct and separable from the others [in the trial] that a [new] trial of it alone may be had without injustice." Gasoline Prod. Co. v. Champlin Ref. Co., 283 U.S. 494, 500, 51 S.Ct. 513, 515, 75 L.Ed. 1188 (1931). In this circuit, a district court in considering a trial on less than all of the issues must determine that (1) the issues are clearly distinct; (2) the bifurcation will not prejudice either party; and (3) the action will result in judicial economy. See Taylor v. RayGo, Inc., 680 F.2d 1223, 1224 (8th Cir.1982). If the issues are not clearly separable, a bifurcation of issues is an abuse of discretion. O'Dell v. Hercules, Inc., 904 F.2d 1194, 1202 (8th Cir.1990). Bifurcation must be very cautiously considered where the injury itself, as here, has an important bearing on liability. Id. (citing Hosie v. Chicago & North Western R.R., 282 F.2d 639, 643-44 (7th Cir.1960)), cert. denied, 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693 (1961). I can see no reasoned way for this court to deviate from these principles in making a decision to remand this case for retrial on damages only.
 
 
 77
 As discussed, under the evidence adduced and instructions given, the finding of sufficient harm to impose liability and the finding of only nominal damages as a result of the breach of duty are not necessarily inconsistent. See, e.g., Cowans, 862 F.2d at 700 (if jury finds cruel and unusual punishment--which finding involves an element of harm--nominal damages are proper if jury is unable to place a monetary value on harm suffered). Even so, the result here points toward a compromise verdict. In other words, the verdict strongly suggests a recognition by the jury of the inter-relationship of the issues and a trade-off between liability, causation, and damages. In the face of a compromise verdict, courts have never found the issues to be sufficiently separable to approve a retrial on one issue only. See, e.g., Smallwood v. Dick, 114 Idaho 860, 761 P.2d 1212, 1216 (1988). See generally, Jack B. Weinstein, Routine Bifurcations of Jury Negligence Trials, 14 Vand.L.Rev. 831, 842 (cited in the 1966 amendment notes to Fed.R.Civ.P. 42(b)).
 
 
 78
 The possibility of a compromise verdict leads to my third concern, a problem neither the majority nor the dissent sufficiently discusses. The jury instruction on Eighth Amendment liability was flawed. Granted, there was not an adequate objection to the improper instruction by the defendant at trial and, I would usually require the defendant to live with any untoward result. However, the faulty instruction becomes an overriding concern when considering a remand for retrial, especially on one issue only.
 
 
 79
 The improper liability instruction was given twice, in differing versions. Both versions were inconsistent with proper Eighth Amendment jurisprudence. It was first stated as follows:
 
 
 80
 Prison officials may be liable for violation of a prisoner's civil rights, where they are deliberately indifferent to a prisoner's constitutional right to be free from sexual attacks by other inmates, if they actually intend to deprive them of that right, or if they act with careless disregard of this right. Reckless disregard of the prisoner's right to be free from sexual attacks by other inmates may be shown by the existence of a pervasive risk of harm to inmates from other prisoners and failure of prison officials reasonably to respond to that risk.
 
 
 81
 Trial Transcript Vol. V at 45. Later, the judge, stating that he had misread the instruction, said:
 
 
 82
 Prison officials may be liable for a violation of a prisoner's civil rights where they are deliberately indifferent to a prisoner's constitutional right to be free from sexual attacks by other inmates; or if they actually intend to deprive him of that right; or if they act with reckless disregard of that right. Reckless disregard of a prisoner's right to be free from sexual attacks by other inmates may be shown by the existence of pervasive risks of harm to inmates from other prisoners and the failure of prison officials to reasonable--reasonably respond to that risk.
 
 
 83
 Trial Transcript Vol. V at 51.
 
 
 84
 Neither version of the instruction defines a standard of care from which an Eighth Amendment violation may emerge.
 
 
 85
 "To be cruel and unusual punishment, conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety.... It is obduracy and wantonness not inadvertence or error in good faith, that characterize the conduct prohibited by the cruel and unusual punishments clause."
 
 
 86
 Wilson v. Seiter, --- U.S. ----, ----, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991) (some emphasis omitted) (quoting Whitley v. Albers, 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986)).[2] The instructions given allowed the jury to find liability from acts or omissions not encompassed within the Wilson v. Seiter test. So, the dissent would solve a purported damages error on the part of the jury while allowing error on the part of the trial judge to stand untouched. And, although the dissent may argue that it has no duty to rectify an error not brought to the attention of the trial court, it readily seeks to reverse a finding of only $1.00 nominal damages when the jury was told, certainly without objection from the plaintiffs and probably at the request of the plaintiffs, that
 
 
 87
 [i]f you find that plaintiff is entitled to a verdict, but do not find that plaintiff has sustained actual damages, then you must return a verdict for that plaintiff in amount of $1.00 as nominal damages.
 
 
 88
 Trial Transcript Vol. V at 49. I refuse to join in such an unbalanced approach. Accordingly, I concur in the result reached by Judge Magill.
 
 
 89
 BRIGHT, Senior Circuit Judge, with whom RICHARD S. ARNOLD, Chief Judge, LAY, Senior Circuit Judge, McMILLIAN, WOLLMAN and MORRIS SHEPPARD ARNOLD, Circuit Judges, join, concurring in part and dissenting in part.
 
 
 90
 We concur in the rejection of the cross-appeal by Denis Dowd, Superintendent of the Farmington Correctional Center (FCC). However, we would reverse on the appeal by Frank A. Ledferd, David Corder, Hershel Marsh and Jay M. French [hereinafter plaintiffs-appellants] and grant them a new trial on damages. Inasmuch as the Court affirms the nominal damages award, we approve of the award of attorneys' fees made by the trial court.
 
 
 91
 The plaintiffs-appellants in this case are prisoners who bring this § 1983 action, seeking money damages and equitable relief against former Superintendent Dowd and four members of his staff for their failure to protect them from the savage and heinous acts of homosexual rape in prison. The jury, although finding in favor of plaintiffs-appellants on liability, awarded each only $1.00.
 
 
 92
 By a slim seven to six vote, this court affirms the trial court's refusal to grant a new trial on damages.[1] The Court, in our view, engages in speculation, not supported by the record, the instructions or the parties' contentions in their arguments to the jury, in approving a verdict denying plaintiffs-appellants actual damages for the rapes.
 
 
 93
 We dissenters, following well-reasoned policy developed by courts in this circuit relating to control of prison brutality, believe a shocking injustice has been done in this case; that no justification exists for the jury's award denying the plaintiffs-appellants actual damages. Consequently, we would remand for a new trial on damages alone and instruct the trial court to consider injunctive relief.
 
 
 94
 The principal issue on appeal is whether the trial court erred in denying the plaintiffs-appellants' motion for a new trial. In our opinion, it did. We differ here with the principal opinion[2] because we feel damages resulting from a rape--any rape--can never be valued at only $1.00, particularly in this case, where defendant Dowd at trial never denied the rapes occurred, but asserted they were not the warden's responsibility.
 
 I.
 
 95
 This circuit is not unfamiliar with prison rape and the attending responsibilities prison administrators have to curb such conduct. In 1969, then Chief District Judge J. Smith Henley ruled that cruel and unusual conditions existed at the Cummins Farm Arkansas Penitentiary. Commenting on the problem of sexual assaults at the prison, he wrote:
 
 
 96
 An inmate who is physically attractive to other men may be, and frequently is, raped in the barracks by other inmates. No one comes to his assistance; the floor walkers do not interfere; the trusties [prisoners entrusted to guard other prisoners] look on with indifference or satisfaction; the two free world people on duty appear to be helpless.
 
 
 97
 Inmates who are passively homosexual are called "punks." There are varieties of "punks," including the "pressure punks" who will engage in homosexual acts if more or less pressure is put upon them to induce or compel them to do so.
 
 
 98
 In an effort to protect young men from sexual assaults, they are generally assigned to the two rows of cots nearest the front bars of the barracks, which portion of the barracks is called "punk row." It appears, however, that if would-be assailants really want a young man, his being assigned to the "row" is no real protection to him.
 
 
 99
 To the extent that consensual homosexual acts take place in the barracks, they are not carried out in any kind of privacy but in the full sight and hearing of all of the other inmates.
 
 
 100
 Sexual assaults, fights, and stabbings in the barracks put some inmates in such fear that it is not unusual for them to come to the front of the barracks and cling to the bars all night. That practice, which is of doubtful value is called "coming to the bars" or "grabbing the bars." Clearly, a man who has clung to the bars all night is in poor condition to work the next day.
 
 
 101
 Holt v. Sarver, 309 F.Supp. 362, 377 (E.D.Ark.1970) (Holt II ), aff'd, 442 F.2d 304 (8th Cir.1971).[3] After reviewing the conditions at the penitentiary, Judge Henley observed:
 
 
 102
 For the ordinary convict a sentence to the Arkansas Penitentiary today amounts to a banishment from civilized society to a dark and evil world completely alien to the free world, a world that is administered by criminals under unwritten rules and customs completely foreign to free world culture.
 
 
 103
 Id. at 381. Judge Henley ordered injunctive relief to rectify the unconstitutional conditions, concluding:
 
 
 104
 Let there be no mistake in the matter; the obligation of the Respondents to eliminate existing unconstitutionalities does not depend upon what the Legislature may do, or upon what the Governor may do, or, indeed, upon what Respondents may actually be able to accomplish. If Arkansas is going to operate a Penitentiary System, it is going to have to be a system that is countenanced by the Constitution of the United States.
 
 Id. at 385.[4]
 
 105
 Fifteen years later, Judge Ross in Martin v. White, 742 F.2d 469 (8th Cir.1984) addressed the problem of sexual assaults at the Missouri Training Center, stating:
 
 
 106
 In this case we deal with a subject matter which has become a national disgrace in some of our nation's prisons. We speak, of course, of the inability or unwillingness of some prison administrators to take the necessary steps to protect their prisoners from sexual and physical assaults by other inmates.
 
 
 107
 Id. at 470. Judge Ross concluded: "Subjecting prisoners to violent attacks or sexual assaults, or constant fear of such violence, shocks modern sensibilities and serves no legitimate penological purpose. We reject as below any level of decency the theory that sexual or other assaults are a legitimate part of a prisoner's punishment." Id. at 474 (citations omitted).
 
 II.
 
 108
 Here, the jury's verdict established that Dowd operated FCC in reckless disregard for the prisoners' constitutional rights by failing to take proper steps to prevent sexual assaults when he knew such assaults were occurring. The evidence is summarized in the principal opinion. Ante, at 663-69. We also adopt the statement of facts from the panel opinion. Ledferd v. Dowd, Nos. 90-2090, 90-2091, slip op. at 3-8 (8th Cir. Feb. 6, 1992), vacated on grant of reh'g en banc (1992). The evidence on liability must be taken favorably to support the determination in favor of the plaintiffs-appellants on liability. Each unquestionably suffered physical and emotional damages as a result of the rapes caused by the defendant's recklessness. Indeed, it is conceded in the principal opinion that at a minimum:
 
 
 109
 [t]he jury did find that the defendant's unconstitutional actions were the cause in fact of at least one of the attacks on each plaintiff. The jury could, however, have found the defendant's unconstitutional actions were not the cause in fact of many of the plaintiffs' injuries and still have returned a verdict for plaintiffs.
 
 
 110
 Ante, at 670. However, for some reason the jury decided that none of the plaintiffs-appellants should obtain actual damages.
 
 
 111
 Juries usually award nominal damages in cases where some question exists about whether a prisoner suffered any injury as a result of a constitutional violation, such as a denial of procedural due process. E.g., Graham v. Baughman, 772 F.2d 441, 447 (8th Cir.1985). However, in eighth amendment cases a jury must find that a defendant willfully or recklessly inflicted pain on the plaintiff to find for the plaintiff at all. See Whitley v. Albers, 475 U.S. 312, 320, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986). Upon a finding of an eighth amendment violation, a plaintiff automatically receives at least nominal damages. Cowans v. Wyrick, 862 F.2d 697, 700 (8th Cir.1988). In such cases, a jury may award only nominal damages if it cannot place a monetary value on the victim's injuries. Id. at 700. This court commented in Cowans that nominal damages are, in effect, impossible in prison assault cases, for the injuries suffered in those cases are "too obvious to address." Id. at 700 (citing as examples Vosburg v. Solem, 845 F.2d 763 (8th Cir.), cert. denied, 488 U.S. 928, 109 S.Ct. 313, 102 L.Ed.2d 332 (1988); Martin v. White, 742 F.2d 469 (8th Cir.1984)). A reasonable explanation for the jury awarding only nominal damages in this case is that the jury concluded it did not want to give tax dollars as a damages award to persons in prison. The failure to award damages, in our opinion, constitutes a miscarriage of justice.
 
 III.
 
 112
 Before addressing the viewpoint of damages in the principal opinion of the Court, we think it appropriate to reiterate important undisputed evidence in the record. The record is replete with evidence the plaintiffs-appellants suffered terror and tremendous pain as a result of the rapes. Appellant Hershel Marsh, a nineteen-year-old, first-time offender testified that, within a couple of hours of arriving at FCC, inmate William Stapleton told him he was going to "fuck" him. Stapleton raped Marsh the following night and repeatedly thereafter. Marsh testified that, as a result of the rapes, he suffered from ulcers and lack of sleep, for which a prison psychiatrist prescribed sleeping pills. Inmate Ivron Butler testified he observed Marsh vomiting numerous times after being raped by Stapleton.
 
 
 113
 Appellant Frank A. Ledferd, an eighteen-year-old, first-time offender, testified that, within two weeks of his arrival at FCC, he was raped by inmate Rob Johnson. Ledferd immediately sought protective custody, which prison officials denied because Ledferd refused to implicate Johnson. Shortly thereafter, Ledferd sought to straighten things out on his own and was advised by his cellmate to talk with Stapleton. Ledferd went to Stapleton's cell, where Stapleton immediately closed the door shut, told him to face the wall when the guard walked by, and then proceeded to rape him. Ledferd testified he suffered anal bleeding for a week and a half after Stapleton raped him. He also stated he continues to suffer torment and depression as a result of the attacks.
 
 
 114
 Appellant David Corder, a twenty-three-year-old, first-time offender, testified that Stapleton also raped him. Corder testified that, as a result of the rape, he had difficulty defecating and urinating, and lost his appetite. Corder also testified he suffered from headaches after Stapleton struck him on the head during an assault.
 
 
 115
 Appellant Jay M. French was twenty-one years old and, although he had been in jail, he had never been in prison before entering FCC. French testified inmate Darryl Saddler raped him and inmate George Anderson both raped and beat him. Inmate Doyle Kirkman testified French broke down in tears when French later described the ordeal to him.
 
 
 116
 The rationale in the principal opinion for denying actual damages is well capsulated in the contention "[t]he jury could, however, have found the defendant's unconstitutional actions were not the cause in fact of many of the plaintiffs' injuries and still have returned a verdict for plaintiffs." Ante, at 670. To support such a theory, a scenario is surmised in which the jury might have selectively accepted a "this" fact and rejected a "that" fact from the testimony.
 
 
 117
 We note the obvious incredibility of the conclusions in the principal opinion on damages when we examine the record against the backdrop of counsel's presentation of arguments to the jury. First, plaintiffs-appellants' counsel stated that nobody, not even the defendant, denied the plaintiffs-appellants were sexually attacked by other prisoners. Trial Tr., Vol. V p. 15. Second, Dowd's counsel did not challenge that assertion. At trial, Dowd's attorney stated: "Denis Dowd ... doesn't know if they were sexually assaulted." Trial Tr., Vol. V p. 24. Dowd's defense asserted a denial of any responsibility for the rapes.[5] Third, defendant's counsel recognized that plaintiffs-appellants' case rested on
 
 
 118
 The Victim Profile, The Attacker Profile. You heard their testimony that we're small, the attackers are big. We're white, the attackers are black. We're young, they were not. And we're in jail for armed robbery, sodomy, child abuse, deviate sexual assault, and burglary. These people were violent. You shouldn't have put us in with these violent people, because they would attack us and you should have known that.
 
 
 119
 Trial Tr., Vol. V p. 30. Counsel added, quoting denial by Dowd, "I don't believe that profile exists." Trial Tr., Vol. V p. 30.
 
 
 120
 Contrary to the view expressed in the principal opinion that each plaintiff-appellant suffered only a single attack (although even a single attack justifies a substantial award), the jury's liability determination rested on uncontested proof of several rapes to each plaintiff-appellant. In this regard, we observe that Dowd did not segregate his defense on individual rapes, but denied responsibility for all that occurred. Moreover, the instruction referred to not one (see ante, at 670), but "one or more sexual attacks." Trial Tr., Vol. V p. 47.
 
 
 121
 Finally, the jury instructions belie the contention in the principal opinion that plaintiffs-appellants consented to sexual activity with fellow prisoners and, thus, are entitled only to nominal damages. The trial court instructed:
 
 
 122
 If you find that any one or more of the plaintiffs consented or was not forcibly compelled to engage in any alleged sexual conduct with other inmates, then your verdict must be for the defendant. Consent or lack of consent may be expressed or implied. Forcible compulsion means physical force that overcomes reasonable resistance or a threat that places a person in reasonable fear of death or serious physical harm. When I use the word consent, I mean willingness, in fact, for conduct to occur. It may be manifested by action or inaction. It need not be communicated to the actor. If words or conduct are reasonably understood by another to be intended as consent, they constitute apparent consent and are as effective as consent in fact.
 
 
 123
 However, consent is not effective, if it is given under duress. Duress is constraint of another's will by which a person is compelled to give consent whether or not he is, in reality, willing to do so.
 
 
 124
 Trial Tr., Vol. V pp. 46-47. In light of the evidence and this instruction, the assertion in the principal opinion must be rejected.
 
 
 125
 In these circumstances, the award in this case shocks our senses. Even the assumption in the principal opinion, that the jury verdict may reflect that each appellant suffered only a single incidence of rape related to the unconstitutional conduct of Dowd, clearly warrants more than $1.00 in damages. That the brutal acts to which the plaintiffs-appellants were subjected are somehow on the de minimis end of a damages scale is, in our opinion, a sad commentary on this case. In light of our discussion above, the award is so inadequate as to constitute a plain injustice to the plaintiffs-appellants. Nelson v. All American Life and Financial Corp., 889 F.2d 141, 152 (8th Cir.1989). Accordingly, we would remand this case for a trial on damages.
 
 IV.
 
 126
 In the principal opinion, Corder's plea for injunctive relief is denied on the grounds that Corder fails to present sufficient evidence indicating he is currently subject to a pervasive risk of attack. The district court summarily denied Corder's plea for injunctive relief. Because Corder's claim may have merit, particularly in light of other evidence uncovered in this case, we would remand to determine the scope of the threat faced by Corder,[6] and permit the district court, at its discretion, to reopen the record for additional evidence on this issue. Plaintiffs-appellants, including Corder who remains incarcerated, have made a number of reasonable requests for injunctive relief that deserve scrutiny. Corder specifically requested a training program for FCC employees to acquaint them with the risks of sexual assaults; the development of procedures to be followed with respect to sexual assault complaints; the development of an orientation program to instruct new prisoners on their vulnerability to sexual assault; the development of a system to segregate predatory prisoners from more vulnerable prisoners; the establishment of protective custody cells which are available upon demand without the need for a preliminary stay in the punitive environment of administrative segregation; the implementation of a system which would protect prisoners from being held captive by other prisoners in a cell through the night; the establishment of procedures for the investigation and referral of sexual assault complaints to the local prosecuting attorney; the establishment of punishments for predatory prisoners; and the review of job assignments for predatory prisoners to ensure they have no contact with those seeking protective custody.
 
 
 127
 MORRIS SHEPPARD ARNOLD, Circuit Judge, dissenting, with whom McMILLIAN, Circuit Judge, joins.
 
 
 128
 I write separately to offer some observations appropriate to this case on the subject of damages for pain and suffering. Many lawyers evidently regard such damages as a kind of tertium quid, neither compensatory nor exemplary, simply an inscrutable sop to a tort victim. This attitude manifests itself in a number of odd ways. For instance, in Arkansas, the jury is not asked to discount an award for future pain and suffering to present value as it is with respect to other sorts of future damages. See AMI Civil 3d, 2201, 2205, 2206, 2207, 2209, 2219. Lawyers will also typically describe pain and suffering damages as "non-economic," further emphasizing the belief in their peculiar character. I suggest, too, that even economists have contributed to the confusion by calling those kinds of losses "non-pecuniary."
 
 
 129
 The truth is, however, that these kinds of awards are necessarily compensatory in nature. Their aim, therefore, must be to make the sufferer as content or happy as he or she would have been but for the compensable injury. Putting the matter this way usefully highlights the difficulty that juries may often have in assessing damages for mental suffering. Without evidence of what kinds of things increase a particular plaintiff's subjective welfare, that is, his or her enjoyment of life, and without evidence of their cost, juries may feel that they are operating in the dark. It is a question whether, in a proper case, a court ought to direct a verdict on the question of damages for suffering because insufficient evidence on compensation has been presented, but no such request was made here; and, moreover, the custom seems to be to allow the question to go to the jury if there is sufficient evidence that pain and suffering actually occurred. This latter characteristic of current practice may simply be another manifestation of the inscrutable sop theory of pain and suffering damages. But there is another, perhaps more probable explanation for it. Jurors are regularly invited to use their common sense and the knowledge that they have in the ordinary affairs of life in arriving at their verdicts. Presumably, they are expected to arrive at an appropriate figure for compensating pain and suffering based on their experience with the general run of humanity. Besides, the correct measure of damages may well be the generic or market value of the pain suffered, though this is not well developed in the cases.
 
 
 130
 Because a number fixed on in this fashion is likely to be reasonable if it falls within rather broad and elastic limits, an award for pain and suffering will only rarely be disturbed on appeal, especially since we review the award by asking whether it is "shocking" or "monstrous," itself at least a partly subjective inquiry with each judge. (One wonders if there is some transcendent objective conscience that we are supposed to be consulting.) But in this case, the act that was committed was so horrendous that no reasonable person could have found that the plaintiffs' suffering was de minimis. It is true that the record on the extent of damages, not to mention what kind of compensation was appropriate, was not well developed. But zero is, in my mind, a wholly unacceptable number, indeed a shocking one, and I would therefore remand for a retrial on the issue of damages. It is just possible that the jurors regarded the prisoners' life as so dismal and degraded before the rapes that the rapes did not diminish their enjoyment of it. But, in my view, no reasonable person could have come to that conclusion on this record. It is also possible that the jury meant to indicate by their verdict not that they had unanimously agreed to award the plaintiffs nothing, but, instead, that they were unable to agree on a particular number. But, even so, a new trial on damages would be required because the jury was hung. I do not read Cowans v. Wyrick, 862 F.2d 697 (8th Cir.1988), or Warren v. Fanning, 950 F.2d 1370 (8th Cir.1991), cert. denied, --- U.S. ----, 113 S.Ct. 111, 121 L.Ed.2d 68 (1992), as being inconsistent with or contrary to this last observation.
 
 
 131
 I therefore respectfully dissent from the judgment of the court.
 
 
 
 [1]
 The Honorable Robert L. Kingsland, United States Magistrate Judge for the Eastern District of Missouri
 
 
 [2]
 Three of the plaintiffs have since been released. Only David Corder is still incarcerated. His first parole hearing is set for December 1992
 
 
 [3]
 Two other inmates were also plaintiffs in the original action. Their claims were voluntarily dismissed before trial
 
 
 [4]
 The other defendants were dismissed by plaintiffs prior to trial. The five other causes of action were dismissed by plaintiffs after the evidence had been presented to the jury but before the case had been submitted to them
 
 
 [5]
 This policy has been changed to require that the cell doors be open at all times during open wing. One of the plaintiffs, David Corder, filed a grievance protesting this change of policy
 
 
 [6]
 The Classification Committee evaluates requests for protective custody and recommends a course of action to the Superintendent. The Committee also evaluates requests by prisoners in administrative segregation waiting for protective custody or by those already in protective custody to be returned to general population
 
 
 [7]
 A closed cell door automatically locks. When prisoners wish to leave the cell, they call out their cell number. The officer in the bubble hears this through the microphones in the ceiling of the wing and presses a button that opens the door. Therefore, a guard is not present when the prisoners leave the cell and would not necessarily notice if the prisoners were not the inmates assigned to the cell
 
 
 [8]
 He was not, however, reassigned to the same cell
 
 
 [9]
 Daniel Henry, an official at FCC, testified that, while serving as Acting Superintendent during Dowd's absence, he approved a Classification Committee recommendation that French, who had requested protective custody because he was being pressured for sex by another inmate, be returned to general population. French said he wished to return to general population because he preferred that to going to administrative segregation pending bed space in protective custody. Henry did not conduct any investigation into French's allegations, and he approved returning French to his prior cell even though that cell was in close proximity to the cell of the inmate French claimed was pressuring him for sex. Henry had no instructions to conduct an investigation or to take any other action in this type of case
 
 
 [10]
 All the inmates accused of rape in this case were serving long sentences for violent crimes and have histories of violence toward other prisoners
 
 
 [11]
 Plaintiffs originally sued for, inter alia, transfer to the Missouri Eastern Correctional Center. That prison does not have any protective custody available, and sends those inmates who need protective custody to FCC
 
 
 [12]
 Several other FCC officials also testified that no prisoner who persists in their request for protective custody throughout the review process is ever denied protective custody
 
 
 [13]
 We may speculate that the jury could have concluded the plaintiffs did not prove the defendant caused all of their injuries because the plaintiffs submitted to the jury a general verdict form concerning the question of damages--one that makes it impossible to determine which claims the jury did or did not believe. Cf. Williams v. North Carolina, 317 U.S. 287, 63 S.Ct. 207, 87 L.Ed. 279 (1942) (general verdict of guilty cannot stand if one potential ground is unconstitutional because a general verdict does not state what the jury decided)
 
 
 [14]
 Dr. Sable's testimony concerning rape trauma syndrome consists solely of the following: "There can be what's generally described as the rape trauma syndrome, which includes emotional, cognitive and psychological consequences." Tr., Vol. III at 56. He also testified that rape can cause physical injury and infection. Id. Because neither he nor any medical doctor examined the plaintiffs at the time of any of the attacks, there is no medical evidence that the plaintiffs received physical injury
 
 
 [15]
 Each plaintiff admitted on cross-examination to signing the statements. See cross-examination of Hershel Marsh, Tr., Vol. II at 202; cross-examination of Frank Ledferd, Tr., Vol. III at 139; cross-examination of Jay French, Tr., Vol. III at 166, 168; cross-examination of David Corder, Tr., Vol. III at 216
 
 
 [16]
 See cross-examination of Hershel Marsh, Tr., Vol. II at 213-17; cross-examination of Jay French, Tr., Vol. III at 176; cross-examination of David Corder, Tr., Vol. III at 203-09
 
 
 [17]
 After trial, Jim Purket replaced Denis Dowd as Superintendent of FCC. Plaintiffs moved pursuant to Fed.R.Civ.P. 25(d)(1) to add Purket as a party defendant in his official capacity. Because we find that plaintiffs are not entitled to equitable relief, we affirm the district court's denial of this motion
 
 
 [18]
 Plaintiffs' requested jury instruction concerning liability provided that in order for the jury to find in favor of the plaintiffs, it must find:
 One, the plaintiff was subjected to one or more sexual attacks by prisoners in Farmington Correctional Center. Two, defendant knew or should have known the prisoners, such as plaintiff, were subject to a pervasive risk of sexual attack. Three, defendant failed to respond reasonably to the risk of such attacks. Four, the defendant's conduct was a proximate cause of the plaintiff's injury. And five, the plaintiff was injured.
 Tr., Vol. V at 48. Plaintiffs' requested declaratory relief was identical to the liability jury instruction. Appellants' App. at 28, Pls.' Mem. in Support of Their Motion for Declaratory and Injunctive Relief.
 
 
 [19]
 At oral argument, Judge Magill commented that the only victory that plaintiffs can claim is $4, and that's not very much of a victory. Plaintiffs' attorney responded that they had $4 and a declaration implicit in the verdict that a very important constitutional right was denied these men
 
 
 [20]
 We address this issue only as it relates to Corder because he is the only plaintiff still incarcerated. The claims for injunctive relief of the other three plaintiffs, who have been released from prison, are moot
 
 
 [21]
 See Corder Testimony, Trial Tr., Vol. III at 218-19. Prison policy changed to require inmates to keep their doors open during open wing period, when free movement of inmates within the wing is allowed
 
 
 [22]
 See supra Part I. at 668 n. 11
 
 
 [23]
 The argument before us is that the attorneys' fees should be reduced. This is a different issue from the question of whether a plaintiff can get attorneys' fees when they are awarded only nominal damages at trial. The circuits are split on this issue. Compare Domegan v. Ponte, 972 F.2d 401 (1st Cir.1992); Romberg v. Nichols, 953 F.2d 1152 (9th Cir.1992) (per curiam) (nominal damages make plaintiff prevailing party for purposes of obtaining attorneys' fees pursuant to 42 U.S.C. § 1988); Ruggiero v. Krzeminski, 928 F.2d 558, 564 (2d Cir.1991) (same); Coleman v. Turner, 838 F.2d 1004 (8th Cir.1988) (per curiam) (same); Nephew v. City of Aurora, 830 F.2d 1547 (10th Cir.1987) (en banc) (same), cert. denied, 485 U.S. 976, 108 S.Ct. 1269, 99 L.Ed.2d 481 (1988); and Garner v. Wal-Mart Stores, Inc., 807 F.2d 1536, 1539 (11th Cir.1987) (same) with Estate of Farrar v. Cain, 941 F.2d 1311 (5th Cir.1991) (nominal damages do not make plaintiff prevailing party for purposes of obtaining attorneys' fees pursuant to 42 U.S.C. § 1988), cert. granted, --- U.S. ----, 112 S.Ct. 1159, 117 L.Ed.2d 407 (1992). Because this issue is not before us in this case, we do not address it
 
 
 [24]
 The court disallowed .1 hour because it was paralegal time and not compensable in attorneys' fees. Dowd does not dispute that plaintiffs' attorneys spent 946.9 hours working on the claim on which they succeeded and claims related to it
 
 
 [25]
 Specifically, the FCC instituted a new policy requiring that the doors of all prisoners be open during its "open wing" period
 
 
 [1]
 This term was used by the district court in its instruction outlining the nature of plaintiffs' allegations of constitutional violations. Trial Transcript Vol. V at 44
 
 
 [2]
 I realize that some of our post-Seiter cases establish "reckless disregard" as the standard of care in Eighth Amendment claims. See Elliott v. Byers, 975 F.2d 1375 (8th Cir.1992); Falls v. Nesbitt, 966 F.2d 375 (8th Cir.1992). In my view, a finding of obduracy and wantonness requires more; certainly more is required than an official failing to respond "reasonably" to a risk of harm, as stated in both instructions
 
 
 [1]
 The panel majority (Judges Lay and Bright) voted to reverse the district court. Judge Magill, dissenting, voted to affirm. Ledferd v. Dowd, Nos. 90-2090, 90-2091 (8th Cir. Feb. 6, 1992), vacated on grant of reh'g en banc (1992)
 
 
 [2]
 In light of the differences in views of the members of this Court represented in the several opinions--six votes to affirm the district court per Judge Magill's opinion; six votes to grant a new trial on damages alone in this dissenting opinion and including the separate dissent of Judge Morris Sheppard Arnold; and one separate concurrence by Judge Beam joining the result reached in Judge Magill's opinion, but stating he would reverse and remand for a new trial on all issues--this dissent refers to Judge Magill's opinion as the principal opinion in this case
 
 
 [3]
 The complete history of this case reads as follows: Holt v. Sarver, 300 F.Supp. 825 (E.D.Ark.1969) (Holt I ); Holt v. Sarver, 309 F.Supp. 362 (E.D.Ark.1970) (Holt II ), aff'd, 442 F.2d 304 (8th Cir.1971), further hearings, Holt v. Hutto, 363 F.Supp. 194 (E.D.Ark.1973) (Holt III ) (granting injunctive relief but withdrawing supervisory jurisdiction), rev'd as to withdrawal of jurisdiction, Finney v. Arkansas Bd. of Correction, 505 F.2d 194 (8th Cir.1974), further hearings, 410 F.Supp. 251 (E.D.Ark.1976), aff'd, 548 F.2d 740 (8th Cir.1977), aff'd, Hutto v. Finney, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978)
 
 
 [4]
 Both this court and the Supreme Court affirmed Judge Henley. See supra note 2
 
 
 [5]
 Dowd's counsel stated in final argument "[i]t's an unfortunate fact of our society that sexual assaults can happen inside or outside of prisons. What you need to do, like Denis Dowd has done, is make the efforts that you can make to try keeping those to the absolute minimum." Trial Tr., Vol. V p. 26. He added, "I hope you don't believe for a minute that he callously disregarded or was recklessly indifferent to any sexual assaults at the prison." Trial Tr., Vol. V p. 27
 
 
 [6]
 After trial, Jim Purket replaced Denis Dowd as Superintendent of FCC. Plaintiffs moved pursuant to Fed.R.Civ.P. 25(d)(1) to add Purket as a party defendant being sued in his official capacity. The district court denied plaintiffs' motion without explanation. In our view, the district court should add Purket as a party defendant in order to consider injunctive relief