*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 11a0025p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

RUSSELL A. BISHOP,

        *Plaintiff-Appellee,*

    *v.*

No. 09-1791

MARK A. HACKEL, Sheriff; JAMES STANLEY, Deputy; JOHN CANTEA, Deputy; S. ANDERMAN, Deputy; HARRELL, Deputy, Jointly and Severally,

        *Defendants-Appellants,*

KEVIN HARTLEY, Sgt.; ROBERTS, Captain; MOORE, Lt.; SANBORN, J/A; LAURA HOGAN, Deputy,

        *Defendants.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 07-14259—Marianne O. Battani, District Judge.

Argued: December 2, 2010

Decided and Filed: February 1, 2011

Before: MARTIN, GIBBONS, and KETHLEDGE, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Michael S. Bogren, PLUNKETT COONEY, Kalamazoo, Michigan, for Appellants. Heather Anne Glazer, FIEGER, FIEGER, KENNEY, JOHNSON & GIROUX, P.C., Southfield, Michigan, for Appellee. **ON BRIEF:** Mary Massaron Ross, PLUNKETT COONEY, Detroit, Michigan, for Appellants. Heather Anne Glazer, FIEGER, FIEGER, KENNEY, JOHNSON & GIROUX, P.C., Southfield, Michigan, for Appellee.

————————————

**OPINION**

————————————

BOYCE F. MARTIN, JR., Circuit Judge.  Plaintiff-appellee Russell A. Bishop filed a claim under 42 U.S.C. § 1983 against various personnel at the Macomb County Jail, alleging that he suffered sexual abuse by another inmate as a result of their deliberate indifference to his safety needs in violation of the Eighth Amendment.  The jail personnel sought summary judgment on the basis of qualified immunity.  The district court denied the motion as to defendants-appellants Deputy James Stanley, Deputy John Cantea, Deputy Scott Anderman, and Deputy Harrell.  The Deputies filed this interlocutory appeal.  We **REVERSE** the district court's denial of qualified immunity to Cantea, Anderman, and Harrell, and **AFFIRM** the district court's denial of qualified immunity to Stanley.

**I. BACKGROUND**

The upper D-Block of the Macomb County Jail holds approximately seventy-six inmates.  It includes the Mental Health Unit and the Mental Health Step-Down Unit.  The Mental Health Step-Down Unit holds up to twelve inmates with mental health problems who have been stabilized.  On every shift, three corrections officers monitor the upper D-Block.  One corrections officer, assigned to Mental Health Control, is responsible for maintaining a log book.  The other two corrections officers are runners, one for the Mental Health Unit and one for the D-Block.  Runners spend approximately sixty percent of their time making rounds.

On December 1, 2004, Bishop entered the Macomb County Jail on a charge of assault with intent to murder.  Harrell processed Bishop through booking and filled out a form entitled "Initial Classification/Temporary Cell Assignment."  The form described Bishop's physical build as small.  It indicated that he had been in a number of mental institutions and had attempted suicide.  The form also stated that Bishop was unable to understand questions; exhibited angry or hostile and bizarre behavior; and appeared

anxious or afraid, depressed, confused, and unusually embarrassed. Harrell completed a referral form that scheduled Bishop for a mental health assessment by Correctional Medical Services, which provided mental health services for the inmates.

Bishop was placed in the Mental Health Unit's high observation cell. Later that day, Bishop was moved to the general Mental Health Unit on the recommendation of Scott Webster, a limited license psychologist with Correctional Medical Services.

On December 10, Laura Hogan, a limited license psychologist with Correctional Medical Services, conducted a mental health assessment of Bishop and recommended that he be placed in the Mental Health Step-Down Unit. Bishop was housed in the Mental Health Step-Down Unit from December 10 through December 25.

On December 10, inmate Charlie Floyd was placed in the Mental Health Step-Down Unit on the recommendation of Webster. Floyd had been charged with multiple counts of criminal sexual conduct. On December 13, Floyd was accused of a major rule violation when he was seen throwing food trays at a jail trustee. He was found guilty of horseplay and placed in administrative segregation from December 14 through December 19. Thus, Bishop was housed with Floyd in the Mental Health Step-Down Unit from December 10 through December 13, and December 19 through December 25. At the time of the alleged assaults, Floyd was forty-four years old, five feet and nine inches tall, and 160 pounds. Bishop was nineteen years old, five feet and five inches tall, and 160 pounds.

On December 25, Bishop met with Hogan for a mental health visit. Hogan testified about her shorthand notes from the meeting. She stated that Bishop reported feeling upset because Floyd wanted to touch his penis. Bishop was not able to identify the date of the alleged incident and he said that he had not reported the abuse to corrections officers. Hogan told Bishop that he could prosecute Floyd for inappropriate sexual behavior, and Bishop said that he wanted to talk to a corrections officer. Hogan advised Stanley about Bishop's allegation.

On December 25 Stanley was working in the Mental Health Step-Down Unit with Anderman and Cantea. Stanley was working as the D-Block runner, Anderman was working as the Mental Health Unit runner, and Cantea was assigned to Mental Health Control. Stanley and Anderman spoke with Bishop, and he informed them that Floyd had been sexually assaulting him. Stanley filled out an Incident Report that stated that he had been informed by the Mental Health staff that Floyd had made sexual advances toward inmates. Stanley handed out witness statement forms to the inmates in the Mental Health Step-Down Unit who were residing there when Floyd was present. All the forms he received back stated that Floyd was physically and sexually abusive to several inmates. Stanley interviewed Bishop and Floyd, as well as inmates Kevin Bradford and Raymond Huffman.

Bishop told Stanley that Floyd started out by stealing his food trays and only allowing him to eat the bread. Then Floyd began to sexually abuse Bishop by forcing him to touch Floyd's penis, laying in bed with him, forcing his pants down, trying to have sex with him, masturbating on him, attempting to have him perform oral sex, and threatening to kill him if he told any officers. Bishop also stated that Floyd hit him, causing Bishop to hit his head on the bed.

Two other inmates also reported inappropriate behavior or abuse by Floyd. Huffman, who was bunked with Floyd in the Mental Health Unit, reported that Floyd said he liked Bishop and thought Bishop was cute. Bradford stated that Floyd stole his food trays and other items, threatened him, forced Bradford to masturbate him, and punched him in the face and pushed him around the unit.

Floyd denied having anything to do with any inmates. He was not questioned for specifics because of the possibility of criminal charges.

Stanley submitted paperwork concerning the allegations against Floyd to his supervisor, Kevin Hartley. A protective order was put in place to keep Floyd and Bishop from having any contact with each other. Floyd was moved from the Mental Health Step-Down Unit. From December 25 through Bishop's January 3, 2005 release, Floyd

was kept in lock-down in the Mental Health Unit and Bishop remained in the Mental Health Step-Down Unit.

In his deposition, Bishop provided testimony concerning Floyd's physical and sexual abuse that was consistent with the statement he initially made to Stanley. He said that upon first meeting Floyd in the Mental Health Step-Down Unit, Floyd threw his head against the bed. He claimed that Floyd stole his food, and when Bishop told corrections officers, they did not do anything. Bishop did not remember how many days later it was that Floyd began sexually assaulting him. Bishop testified that he repeatedly told corrections officers about Floyd sexually assaulting him but they did nothing to stop it. Bishop did not remember the names of the corrections officers he made reports to, could not describe them, and did not remember when he told them or how many times he told them. Bishop said that his December 25 statement constituted his only written statement concerning the incidents of sexual assault by Floyd.

On October 5, 2007, Bishop filed a complaint against a number of Macomb County Jail personnel. In Count I, he made a claim under 42 U.S.C. § 1983, asserting that a number of jail personnel violated his rights under the Eighth Amendment by keeping him housed in a unit where he would be subjected to sexual abuse. In Count II, he sued Macomb County Sheriff Hackel in his official capacity under section 1983 for failing to train employees on how to handle complaints of inmate assault. In Count III, he brought a state law claim for gross negligence and negligence against a number of jail personnel. All defendants moved for summary judgment.

Only a small number of those claims are before us on appeal. The district court granted summary judgment for all defendants on the negligence claims, and for a number of defendants on the section 1983 claims. However, the district court denied summary judgment to Hackel[1] and the Deputies on the section 1983 claims. The district court

---

[1]Although Hackel joined the Notice of Appeal filed by the Deputies, he concedes that under *Johnson v. Jones*, 515 U.S. 304 (1995), he is precluded from immediately appealing the trial court's finding that a genuine issue of material fact exists as to whether the need for training to prevent sexual predators from sexually assaulting other inmates was so obvious that not providing it constituted deliberate indifference. Thus, Hackel's arguments are not presented in the brief of the defendants, and we do not address his appeal.

found that the Deputies were not entitled to qualified immunity from Bishop's Eighth Amendment claims. The district court noted that the doctrine of qualified immunity calls for a two-step analysis: a court must determine (1) whether the facts that the plaintiff alleges make out a violation of a constitutional right; and (2) whether the right at issue was clearly established at the time of the defendant's misconduct. The district court found as an initial matter that an inmate's right to be protected from harm by other inmates is clearly established. Furthermore, the district court found that there was evidence based upon which a jury could find that Bishop's constitutional rights were violated when he was put in the same cell as Floyd. The district court did not analyze the conduct of each Deputy individually, but rather made findings regarding all four Deputies collectively. The district court found that the Deputies were aware that Floyd was incarcerated for several violent felonies, including sexual assault; the Deputies were aware that Bishop was young, small, suffering from severe mental illness, and exhibiting a lack of full mental functioning; and Bishop testified that he told the Deputies before December 25 that Floyd was sexually assaulting him and they ignored his complaints. The district court noted that although the Deputies dispute Bishop's claim that he reported abuse before December 25, it had to construe the evidence in Bishop's favor. The district court found that a jury could conclude that the Deputies were aware of a substantial risk of harm to Bishop and chose to ignore it, thereby violating Bishop's constitutional rights. Thus, the district court denied the Deputies' motion for summary judgment on the ground of qualified immunity. The Deputies filed this interlocutory appeal.

## II. JURISDICTION

Bishop claims that we lack jurisdiction to consider the Deputies' interlocutory appeal from the district court's denial of their motion for summary judgment based on qualified immunity. Under 28 U.S.C. § 1291 (2006), we have jurisdiction to hear an appeal only from a "final decision" of the district court. Denial of summary judgment is usually considered an interlocutory order, not a final judgment, and thus not appealable to this court. *See, e.g.*, *Phelps v. Coy*, 286 F.3d 295, 298 (6th Cir. 2002)

(citing *Johnson v. Jones*, 515 U.S. 304, 309 (1995)).  However, denial of a motion for summary judgment on the ground of qualified immunity may be deemed a final, appealable order because the qualified immunity doctrine exists partly to protect officials from having to stand trial, and a defendant wrongly forced to go to trial loses the benefit of the immunity even if exonerated after trial.  *See id.* (citing *Johnson*, 515 U.S. at 311-12).  Thus, a party may immediately appeal a denial of summary judgment if "(1) the defendant is a public official asserting qualified immunity, and (2) the issue on appeal is not what facts the parties may be able to prove, but whether the plaintiff's facts, taken at their best, show a violation of clearly established law."  *Williams v. Mehra*, 186 F.3d 685, 689 (6th Cir. 1999) (citing *Johnson*, 515 U.S. at 311).

A denial of a claim of qualified immunity is immediately appealable only if the appeal is premised not on a factual dispute, but rather on "neat abstract issues of law." *Johnson*, 515 U.S. at 317 (citation omitted); *see Ortiz v. Jordan*, No. 09-737, 2011 WL 197801, at *5 (Jan. 24, 2011).  The key issue in this case is whether the Deputies were deliberately indifferent to Bishop's safety needs.  The legal standard for deliberate indifference is a question of law, and the Deputies' knowledge and conduct are questions of fact.  Thus, the question in this case—whether the Deputies' conduct, as alleged by Bishop, could constitute deliberate indifference—is a mixed question of law and fact.

We have held that we have jurisdiction to consider an appeal from a denial of qualified immunity if the defendant does not dispute the facts alleged by the plaintiff for purposes of the appeal.  Alternatively, "[i]f, instead, the defendant disputes the plaintiff's version of the story, the defendant must nonetheless be willing to concede the most favorable view of the facts to the plaintiff for purposes of the appeal."  *Berryman v. Rieger*, 150 F.3d 561, 563 (6th Cir. 1998) (internal quotation marks and citation omitted).  In their briefs, the Deputies state that they concede Bishop's version of the facts for purposes of this appeal.  *See* Reply Brief on Appeal of Defendants-Appellants at 2-3 ("[D]efendants do not contest the facts or invite the Court to re-examine and decide disputed fact questions. . . .  Defendants predicate their position, as they must under *Johnson v. Jones*, on Bishop's version of the facts.").

Because the Deputies do not dispute the basic facts for purposes of this appeal, the case turns on a question of law: whether, interpreting the facts as alleged by Bishop, defendants are entitled to qualified immunity from Bishop's Eighth Amendment claims. *Cf. Williams*, 186 F.3d at 690. We have jurisdiction to consider whether Bishop's facts, admitted by the Deputies for purposes of this appeal, show a violation of clearly established law. *See, e.g.*, *Leary v. Livingston Cnty.*, 528 F.3d 438, 441 (6th Cir. 2008); *Williams*, 186 F.3d at 690; *Berryman*, 150 F.3d at 563. Therefore, the district court's denial of qualified immunity is a "final order" under 28 U.S.C. § 1291, and we have jurisdiction to decide the case on the merits. *See Williams*, 186 F.3d at 690. Thus, we must analyze whether, viewing the evidence in the light most favorable to Bishop, the district court's legal determination that the defendants could have acted with deliberate indifference was correct.

## III. QUALIFIED IMMUNITY

Under the doctrine of qualified immunity, government officials performing discretionary functions are shielded from civil liability unless their conduct violates clearly established constitutional rights. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Thus, a defendant is entitled to qualified immunity on summary judgment unless the facts, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established. *Pearson v. Callahan*, 129 S. Ct. 808, 816 (2009). A court of appeals may exercise its discretion to decide which prong of the test to address first in light of the circumstances of the case. *Id.* at 818. Furthermore, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer v. Brennan*, 511 U.S. 825, 844 (1994).

We review a district court's denial of summary judgment on the grounds of qualified immunity de novo. *See Williams*, 186 F.3d at 689. Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The court views the factual evidence and draws all reasonable inferences in favor of the non-moving party. *Nat'l Enters. v. Smith*, 114 F.3d 561, 563 (6th Cir. 1997). The moving party bears the burden of proving that there are no genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

**A. Whether the constitutional right was clearly established**

The Supreme Court has held that for a constitutional right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The Supreme Court has held that "prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833 (internal quotation marks and citation omitted). Furthermore, on several occasions we have recognized an inmate's right to be free from prison violence as clearly established. *See, e.g.*, *Leary*, 528 F.3d at 442 (noting that the right to be free from violence at the hands of other prisoners is clearly established); *Doe v. Bowles*, 254 F.3d 617, 620 (6th Cir. 2001) ("The right of an inmate to be protected from an attack by a fellow inmate was well established at the time the events in question took place."); *Walker v. Norris*, 917 F.2d 1449, 1453 (6th Cir. 1990) ("On several occasions, we have held that 'deliberate indifference' of constitutional magnitude may occur when prison guards fail to protect one inmate from an attack by another . . . ."). Thus, the constitutional right to be free from deliberate indifference to assault and sexual abuse was clearly established at the time of the alleged constitutional violation.

**B. Whether the defendants violated a constitutional right**

To raise a cognizable constitutional claim for deliberate indifference to an inmate's safety, an inmate must make a two-part showing: (1) the alleged mistreatment was objectively serious; and (2) the defendant subjectively ignored the risk to the inmate's safety. *Farmer*, 511 U.S. at 834. Bishop raises an issue of fact as to whether

the alleged mistreatment was objectively serious, and as to whether Stanley subjectively ignored the risk to his safety. However, Bishop fails to raise an issue of fact as to whether Harrell, Anderman, or Cantea subjectively ignored a risk to his safety.

## 1. The objective component

To establish a constitutional violation based on failure to protect, a prison inmate first must show that the failure to protect from risk of harm is objectively "sufficiently serious." *Id.* at 833 (citation omitted). The inmate must show that "he is incarcerated under conditions posing a substantial risk of serious harm." *Id.* The district court found that Bishop was young, small, suffering from severe mental illness, and exhibiting a lack of full mental functioning; and Floyd was incarcerated for violent felonies including sexual assault. Bishop presented a report from Michael Hackett, a criminal justice consultant, that stated that Bishop was vulnerable because he was young, small, apparently mentally "slow," and did not have experience in jail. He stated that these qualities would put a reasonable corrections officer on notice that Bishop required close supervision. Hackett opined that placing Bishop in a cell with an older, stronger, and predatory inmate like Floyd put Bishop in grave danger. Viewing the evidence in the light most favorable to Bishop, he has raised an issue of fact as to whether the failure to protect him from risk of harm was sufficiently serious.

## 2. The subjective component

To establish a constitutional violation based on failure to protect, a plaintiff also must show that prison officials acted with "deliberate indifference" to inmate health or safety. *Id.* at 834. An official is deliberately indifferent if he or she "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." *Id.* at 837. The Supreme Court has held that:

> Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . and a factfinder

> may conclude that a prison official knew of a substantial risk from the
> very fact that the risk was obvious.

*Id.* at 842.  However, a prison official who was unaware of a substantial risk of harm to an inmate may not be held liable under the Eighth Amendment even if the risk was obvious and a reasonable prison official would have noticed it.  *See id.* at 841-42.

The district court erred in this case by failing to evaluate the liability of each Deputy individually.  *See, e.g.*, *Phillips v. Roane Cnty., Tenn.*, 534 F.3d 531, 542 (6th Cir. 2008) ("Where . . . the district court is faced with multiple defendants asserting qualified immunity defenses, the court should consider whether each individual defendant had a sufficiently culpable state of mind."); *Garretson v. City of Madison Heights*, 407 F.3d 789, 797 (6th Cir. 2005) ("[The] subjective component must be addressed for each officer individually.").  Furthermore, the Supreme Court has stated that if the district court does not indicate what facts it assumed when it denied summary judgment, then "a court of appeals may have to undertake a cumbersome review of the record to determine which facts the district court, in the light most favorable to the nonmoving party, likely assumed." *Johnson*, 515 U.S. at 319.  Thus, we must make an individualized assessment of each Deputy, based on Bishop's version of the facts.

Bishop alleges two main theories on which liability for the Deputies could be based.  First, he claims that the Deputies were aware that due to his personal characteristics, Bishop was vulnerable in a jail setting, and particularly vulnerable to attack by Floyd.  The district court found that three factors might have indicated that Bishop was at risk of sexual assault by Floyd: (1) Floyd was four inches taller than Bishop; (2) Floyd was charged with various sex-based offenses; and (3) Bishop was young, had a history of mental illness, appeared to be confused during his intake evaluation, and was thought to be mentally "slow."  In addition, Hackett's report stated that Bishop's personal characteristics would put a reasonable corrections officer on notice that Bishop required close supervision, and that placing Bishop in a cell with a predatory inmate such as Floyd put Bishop in grave danger.  Finally, Stanley testified that there have been numerous sexual predators in the Mental Health Unit.

We have recognized that a prison official may be held to be deliberately indifferent to a substantial risk to inmate safety if he is aware that an inmate is vulnerable to assault and fails to protect him. *See Greene v. Bowles*, 361 F.3d 290, 294 (6th Cir. 2004) (noting that plaintiff could defeat defendant's motion for summary judgment by "point[ing] to evidence from which a finder of fact could conclude that her vulnerability made her placement in [a unit] with high-security inmates a substantial risk to her safety, of which [defendant] was aware"); *see also Taylor v. Mich. Dep't of Corr.*, 69 F.3d 76, 81 (6th Cir. 1995) (rejecting defendant's argument that he could not be liable because he had no personal knowledge of plaintiff's particular vulnerabilities to sexual assault because "*Farmer* makes it clear that the correct inquiry is whether [an official] had knowledge about the substantial risk of serious harm to a particular class of persons, not whether he knew who the particular victim turned out to be"); *Roland v. Johnson*, 856 F.2d 764, 770 (6th Cir. 1988) (denying summary judgment when the jury could find that an administrative assistant to a warden had been shown a picture of an inmate that would suggest that he fit the known profile of prison rape victims).  Thus, Bishop may defeat the Deputies' motion for summary judgment based on qualified immunity if he can raise an issue of fact as to their knowledge of a risk to his safety because of his status as a vulnerable inmate and Floyd's status as a predatory inmate. *Cf. Greene*, 361 F.3d at 295.

Bishop's second theory of liability is that the physical structure of the jail was such that the Deputies would have been able to hear the abuse that he alleges that Floyd committed.  Stanley and Anderman both testified that corrections officers working D-Block are among the inmates about sixty percent of the time.  Stanley testified that guards assigned to the Mental Health Step-Down Unit can hear everything the inmates say, and he admitted that if Floyd was aggressing on other inmates as alleged by Bishop, then it would have been overheard by the guards.  Anderman testified that a corrections officer would have heard what was going on in the Mental Health Step-Down Unit if there were a "ruckus."

In *Phillips*, this Court found that "given the modest size of the jail and the obvious nature of [the victim's] symptoms, we find unpersuasive the claim that the officers were unaware of her condition." *Phillips*, 534 F.3d at 542 n.1. In that case, eighteen jailers and one captain were responsible for a facility with an inmate capacity of fifty-seven. *Id.* Here, three corrections officers were responsible for the upper D-Block, which housed seventy-six inmates. Although the ratio of prison officials to inmates is much lower in this case, Bishop could raise a question of fact as to whether Floyd's aggressions would have been obvious to any corrections officer working in D-Block.

However, under either theory of liability, Bishop must prove that each Deputy had enough personal contact with him to be subjectively aware of his vulnerability to attacks or the abuse that he alleges he was suffering. We have held that there is no "rule that plaintiffs cannot present general allegations to prove that each individual defendant has the requisite knowledge for deliberate indifference." *Id.* at 542. In *Phillips*, the Court concluded that there was sufficient evidence from which a trier of fact could infer that each individual corrections officer was aware of the seriousness of an inmate's ailment, based in part on the fact that the inmate's deteriorating physical condition was obvious. *Id.* However, we must focus on whether each individual Deputy had the personal involvement necessary to permit a finding of subjective knowledge. *See, e.g.*, *Clark-Murphy*, 439 F.3d at 291 ("Given the brief exposures of these two defendants to [plaintiff] and given the resulting absence of evidence regarding their purposeful indifference to his health and safety needs, the claims against these defendants must be dismissed as a matter of law."); *Gibson v. Matthews*, 926 F.2d 532, 535 (6th Cir. 1991) ("[P]ersonal liability on any of the defendants . . . must be based on the actions of that defendant in the situation that the defendant faced, and not based on any problems caused by the errors of others . . . .").

It is important to note that Bishop was unable to identify any of the corrections officers to whom he claimed that he reported abuse. The district court found that:

> Bishop testified that he told the corrections officers before December 25, 2004, that Floyd was sexually assaulting him, and they ignored his complaints. Although the corrections officers and Hogan dispute Bishop's claim that he told the officers before December 25, 2004, about the sexual assaults, the Court must construe the evidence in Bishop's favor.

*Bishop v. Hackel*, No. 07-14259, 2009 WL 1470035, at *6 (E.D. Mich. May 26, 2009). Thus, the district court appears to have found that there was an issue of fact as to whether Bishop reported abuse to the Deputies. In his deposition, however, Bishop states that he does not recall which corrections officers he complained to, he is unable to describe the corrections officers that he complained to, and he does not remember when or how many times he complained. Bishop offers no evidence that he complained to any of the Deputies, or that the Deputies had any knowledge of his alleged complaints. As discussed above, typically a court of appeals, when hearing a qualified immunity case on interlocutory review, does not have jurisdiction to disagree with a district court's decision that the record contains a factual dispute that must be resolved at trial. *See Johnson*, 515 U.S. at 320. In *Scott v. Harris*, 550 U.S. 372 (2007), however, the Supreme Court rejected both the plaintiff's version of the facts and the district court's determination that a genuine factual dispute existed. The Third Circuit has reconciled *Scott* and *Johnson* by saying that *Scott* represents "the outer limit of the principle of *Johnson v. Jones*—where the trial court's determination that a fact is subject to reasonable dispute is blatantly and demonstrably false, a court of appeals may say so, even on interlocutory review." *Blaylock v. City of Philadelphia*, 504 F.3d 405, 414 (3d Cir. 2007). This Court has agreed in an unpublished decision. *See Wysong v. City of Heath*, 260 F. App'x 848, 853 (6th Cir. 2008).

The district court was simply incorrect in its conclusion that Bishop's testimony about complaints to unidentified corrections officers created a genuine issue of material fact as to whether Bishop reported abuse to the defendants in this case. Such an inference is unsupported by the record and thus demonstrably false. Determining whether a defendant is entitled to qualified immunity requires an individual assessment of the knowledge of that defendant. We now turn to that task.

**a. Harrell**

Harrell processed Bishop through booking when he entered the Macomb County Jail on December 1, and he completed a referral form that scheduled Bishop for a mental health assessment. There is no evidence that he had any contact with Bishop after that date.

As noted above, the Supreme Court has held that "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 830. In *Clark-Murphy*, this Court found that the fact that defendants had completed psychological-referral forms was relevant to whether they responded reasonably to a risk of harm to the victim, but this fact did not suffice to establish that they were entitled to qualified immunity as a matter of law because they had repeated interactions with the victim and repeated opportunities to assess the seriousness of the situation. *Clark-Murphy*, 439 F.3d at 290. Here, in contrast, there is no evidence that Harrell had any further contact with Bishop after he completed the referral form. In addition, there is no evidence that Harrell knew that Bishop would be housed in the Mental Health Step-Down Unit or that he would be housed with Floyd. Responding to a risk to an inmate by referring the matter for further investigation or taking other appropriate administrative action may in some cases fulfill an official's protective duties under the Eighth Amendment. In this case, completing the referral form was a reasonable discharge of Harrell's duty to protect Bishop. Taking all of Bishop's facts at their best, he has not raised a triable issue of fact as to whether Harrell exhibited deliberate indifference to his safety needs. Thus, the district court's denial of qualified immunity to Harrell is **REVERSED**.

**b. Anderman**

Anderman testified that he was assigned to the road patrol as a road patrol deputy in December 2004, and he worked road patrol eighty-five to ninety percent of the time. He stated that he was assigned to the jail on December 25, and his best estimate is that

he worked in the jail only on that day. He testified that he did not know Bishop or Floyd prior to December 25. On December 25, Anderman provided security to Stanley while he ran the investigation, posed a few questions to Floyd or Bishop, and assisted the team in moving Floyd from the Mental Health Step-Down Unit into lock-down.

In *Clark-Murphy*, this Court granted summary judgment to two defendants who worked just one eight-hour shift between a plaintiff's seizure and his death several days later. The Court stated that "[w]hile a prison employee doubtlessly could exhibit deliberate indifference toward an inmate in the course of one shift, neither [defendant] had sufficient exposure to [plaintiff] to make out a triable issue of fact that any such wantonness occurred on their part." *Id.* Here, Anderman's single shift where he had contact with Bishop and Floyd was insufficient to raise an issue of fact as to whether he knew of and disregarded an excessive risk to inmate health or safety. Bishop does not allege that he had sufficient contact with Anderman to permit Anderman to perceive his asserted status as a vulnerable inmate, or to observe his alleged altercations with Floyd. Taking all of Bishop's facts at their best, he has not made out a triable issue of fact as to whether Anderman exhibited deliberate indifference to his safety needs. Thus, the district court's denial of qualified immunity to Anderman is **REVERSED**.

**c. Cantea**

Cantea testified that in December 2004 he worked "some time" in Mental Health. He said that he worked in Mental Health "here and there" in the weeks before December 25, but he could not say whether he worked in Mental Health in the days prior to December 25. Cantea testified that he did not remember Bishop from before December 25, he did not have any contact with him before that, and he did not work in D-Block such that he would have been around to hear any complaints or conversations or arguments. Cantea also testified that he did not remember Floyd prior to December 25, he did not know anything about any complaints regarding Floyd prior to December 25, and he did not have any contact with anybody who complained about or discussed Floyd prior to December 25. On December 25, Cantea observed Stanley take Bishop into a

classroom to speak with him.  Cantea walked Floyd from the classroom where Stanley questioned him to his room in the Mental Health Unit.

Cantea's intermittent work in Mental Health during the month of December is insufficient to raise an issue of fact as to whether he knew of and disregarded an excessive risk to inmate health or safety.  Bishop offers no evidence to contradict Cantea's testimony that he had no contact with Bishop or Floyd prior to December 25, and did not work in D-Block enough to hear complaints, conversations, or arguments.  Taking all of Bishop's facts at their best, he has not made out a triable issue of fact as to whether Cantea exhibited deliberate indifference to his safety needs.  Thus, the district court's denial of qualified immunity to Cantea is **REVERSED**.

**d. Stanley**

Stanley had substantially more interaction with Bishop and Floyd than the other Deputies.  In his deposition, Stanley stated that he was assigned to Mental Health in December 2004.  He admitted that he was familiar with both Floyd and Bishop.  He stated that he was aware that Floyd had been charged with criminal sexual conduct and that the police had to call a S.W.A.T. team on him on Thanksgiving.  Furthermore, he testified that Floyd seemed to get along with the other inmates, interacted with them, and talked to them.  In addition, Stanley stated that he talked to Bishop quite often on his rounds.

Taking all of Bishop's facts at their best, a reasonable jury could find that Stanley acted with deliberate indifference under either of Bishop's two theories.  First, Bishop has raised an issue of fact as to Stanley's knowledge of a risk to his safety because of Bishop's status as a vulnerable inmate and Floyd's status as a predatory inmate.  *Cf. Greene*, 361 F.3d at 294.  Bishop defeats Stanley's summary judgment motion because he points to evidence from which a finder of fact could conclude that Stanley was aware that Bishop's vulnerability made his placement in the Mental Health Step-Down Unit with more aggressive inmates such as Floyd a substantial risk to Bishop's safety.  *Cf. id.* at 295.  Bishop presents evidence from which a fact-finder could conclude that Stanley

was aware of Bishop's characteristics, and aware that prisoners with these characteristics are vulnerable to attack.

In *Taylor*, this Court found it probative that the plaintiff contended that the defendant actually knew him. *Taylor*, 69 F.3d at 82. The Court stated that "[d]rawing all inferences in favor of the plaintiff, as we must on this motion for summary judgment, the jury could find that [defendant] had direct knowledge of plaintiff's characteristics because he personally reviewed [plaintiff's] file." *Id.* Here, a jury could find that Stanley was aware of Bishop's personal characteristics because he testified that he talked to Bishop quite often on his rounds.

Furthermore, Bishop presents evidence from which a fact finder could conclude that Stanley was aware that Bishop belongs to a class of prisoners particularly vulnerable to sexual assault. We have favorably cited a case from the Eighth Circuit in which "[t]he court found persuasive that [the defendant] had signed an affidavit that acknowledged that there is a particular type of inmate who is vulnerable to attack." *Id.* (citing *Butler v. Dowd*, 979 F.2d 661, 667 (8th Cir. 1992)). This Court noted that the defendant in that case had testified that "small, youthful prisoners are especially vulnerable to sexual pressure." *Id.* Here, Stanley testified that there had been many sexual predators in the Mental Health Step-Down Unit, it was not uncommon to have four or five sexual predators there at a time, and other inmates complained about sexual pressure.

In *Taylor*, this Court denied summary judgment to a warden because he "arguably knew about the problem of widespread sexual assaults and knew that smaller, youthful prisoners were more vulnerable to attack than others." *Id.* at 84. Thus, whether the warden knew of a substantial risk of sexual assault was a question of fact for the jury. *See id.* Because a reasonable jury could conclude that Stanley was aware of a substantial risk of Bishop being sexually assaulted, summary judgment is not appropriate.

In addition, viewing the facts in the light most favorable to Bishop, a reasonable jury could find that Stanley exhibited deliberate indifference based on Bishop's second theory of liability grounded on the noise generated by the alleged assaults. Stanley testified that guards spend sixty percent of their shifts in D-Block in close proximity to

the inmates, and guards assigned to the Mental Health Step-Down Unit can hear everything the inmates say. Stanley acknowledged that if Floyd had been aggressing on other inmates as alleged by Bishop, then he would have been aware of the situation. He had no explanation for why he did not hear the aggression other than speculation that it might not have occurred. Taking all of Bishop's facts at their best, he has made out a triable issue of fact as to whether Stanley exhibited deliberate indifference to his safety needs. Thus, the district court's denial of qualified immunity to Stanley is **AFFIRMED**.

## IV. CONCLUSION

A government official performing a discretionary function is entitled to qualified immunity on summary judgment unless the facts, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established. *Pearson*, 129 S. Ct. at 816 (2009). An inmate's right to be free from violence at the hands of other prisoners was clearly established at the time of the alleged constitutional violation. *See, e.g.*, *Farmer*, 511 U.S. at 833. Thus, the main issue in this case is whether any of the Deputies violated Bishop's constitutional rights. To raise a cognizable constitutional claim for deliberate indifference to an inmate's safety, an inmate must make a two-part showing: (1) the alleged mistreatment was objectively serious; and (2) the defendant subjectively ignored the risk to the inmate's safety. *See id.* at 834. Bishop was young, small, and mentally ill; and he was incarcerated with Floyd, who was jailed for violent felonies including sexual assault. Viewing the facts in the light most favorable to Bishop, he raises an issue of fact as to whether the alleged mistreatment was objectively serious. Because Bishop raises an issue of fact as to whether Stanley subjectively ignored a risk to his safety, the district court's denial of qualified immunity to him is **AFFIRMED**. However, because Bishop fails to raise an issue of fact as to whether Harrell, Anderman, or Cantea subjectively ignored a risk to his safety, the district court's denial of qualified immunity to them is **REVERSED**.