NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0071n.06

No. 14-5069

FILED
Jan 23, 2015
DEBORAH S. HUNT, Clerk

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

CHARLIE JEAN LILLY,                                )
                                                   )
          Plaintiff-Appellant,                     )
                                                   )
v.                                                 )
                                                   )    ON APPEAL FROM THE UNITED
CITY OF ERLANGER, LIEUTENANT                        )    STATES DISTRICT COURT FOR THE
KEVIN GILPIN, and DETECTIVE                         )    EASTERN DISTRICT OF KENTUCKY
KIMBERLY KLARE,                                     )
                                                   )
          Defendants-Appellees.                    )


BEFORE:     DAUGHTREY, ROGERS, and DONALD, Circuit Judges.

MARTHA CRAIG DAUGHTREY, Circuit Judge. Plaintiff Charlie Jean Lilly alleged that she was assaulted, bound, and raped in her Crescent Springs, Kentucky, apartment on July 9, 2010. Defendants Lieutenant Kevin Gilpin and Detective Kimberly Klare, law enforcement officials from the City of Erlanger who investigated the assault claim, concluded that Lilly concocted the rape allegation for some unexplained reason and thus charged her with falsely reporting an incident. After that charge was dismissed, Lilly filed suit against Gilpin, Klare, and numerous other individuals and governmental entities, raising claims of unlawful arrest, as well as other federal and state causes of action. The district court's grant of summary judgment was proper because the defendants had probable cause to arrest Lilly on the charge lodged against her. Gilpin and Klare possessed the necessary probable cause to support the arrest, and Lilly has

identified no genuine dispute of material fact that would undermine that determination. We therefore affirm the judgment of the district court granting summary judgment to defendants Gilpin and Klare and dismissing Lilly's state-law claims without prejudice. Because Lilly does not challenge the district court's dismissal of her claims against the municipal party, her ostensible appeal against the City of Erlanger has been abandoned.

### FACTUAL AND PROCEDURAL BACKGROUND

In July 2010, Charlie Jean Lilly (formerly known as Leslie Sullivan Wood) was employed at the University of Cincinnati Hospital as a respiratory therapist. Even though she worked in Cincinnati, her primary residence was an apartment in Louisville, Kentucky. To be closer to her place of employment, she also maintained an apartment in a complex in Crescent Springs, Kentucky, where she would stay at least three days per week. What follows is primarily a summary of Lilly's version of the events leading up to this litigation.

Overnight on July 8, Lilly stayed at neither of her rented residences, instead spending the night at the home of her boyfriend in Henryville, Indiana. Lilly admitted that, prior to leaving Henryville on the morning of July 9, she and her boyfriend engaged in consensual intercourse. She then drove to her Crescent Springs apartment, arriving at "around noon." After checking to make sure everything in the apartment was as it should be, Lilly read text messages and sent out her own text message "at maybe 1:30." Because she was not required to clock in at the hospital until 6:45 p.m., Lilly took an Ambien to help her sleep and lay down on her bed for a nap. As was her custom, she first set the alarm on her phone for 5:00 p.m. and placed the phone under her pillow.

Despite having taken an Ambien, Lilly was unable to fall asleep, and so, "a little after two," she got out of bed, dressed in yoga pants and a yoga shirt, went outside onto her balcony,

"and stretched and did some yoga." After coming back into the apartment and closing the balcony door behind her, she decided to shower before dressing for work. She had been in the shower for "probably five minutes" when she thought she heard something in the apartment. She claimed that less than two minutes later, she saw a shadow through the shower curtain just before she was hit in the back of the head and in the face with an object. She then "hung onto that shower [curtain] for dear life" with all her body weight before lapsing into unconsciousness while still wet from the shower.

Lilly claims that when she regained consciousness, she had been tied spread-eagle on her bed with a washcloth in her mouth and a plastic bag over her head. Then, as Lilly stated:

> Like, it felt like somebody was giving me a pap smear. And – and – and then, like, then there was insertion, when there was insertion I guess, I knew that was a penis and I – I moved and that was when he hit me in the face. And he opened up the – I mean, he had a – one of those black ski masks on, so I knew that he was a small man and he had to have been a white man because the way he spoke to me it sounded like something my father would say. And – but I didn't get any type of word. He just knocked me out again. And three times I – I felt like I saw his – through the bag, a shadow like he was jerking off, you know, with like the clothing.

Although unable to describe her assailant in detail, Lilly did claim that "I know he was small. I know his penis was small," that "he wasn't well endowed," and that "he was just a little taller than me." She also offered that the assailant scraped her with what felt like a plastic knife before threatening, "[D]on't take that rag out of your mouth or that plastic bag or I will come back and kill you." Despite that warning, Lilly waited less than 15 minutes after hearing her attacker leave before twisting an arm free, retrieving her phone from under her pillow, and dialing for emergency assistance at 3:37 p.m.

When the police arrived at Lilly's apartment, they found the front door locked and dead-bolted. The back door leading onto the balcony likewise was locked, but Officer Matthew

Kremer was able to climb onto the balcony and kick that door open. Once inside the apartment, the officer unlocked the front door to allow access to other emergency personnel and then checked on the condition of the plaintiff. Kremer noticed that Lilly, who identified herself as Leslie Wood, was lying naked on the bed with strips of red sheet tying her arms and legs to the corners of bed. He also observed a plastic bag over Lilly's head and noted that the restraints were tied very loosely. In fact, another officer, Douglas Eagler, later testified that the sheets were tied so loosely "that had that been me, I believe I could have gotten out of that restraint with minimal effort." Additionally, defendant Kevin Gilpin, upon examining the scene, recognized that only Lilly's left foot was restrained by an actual knot in the sheets. The remaining strips of sheet merely were looped around the plaintiff's extremities such that she should have been able to move her arms freely.

The examination of Lilly's apartment revealed that the bed on which the plaintiff was found was the only furniture in the residence. Despite the fact that Lilly claimed to have been showering when she first was attacked and that she had been dragged out of the shower onto her bed, the police found that the shower head, the shower walls, the bathroom floor, the plaintiff herself, and her bed sheets all were dry. Furthermore, a dry towel remained neatly folded over the side of the bathtub. The only evidence of any struggle in the bathroom of the apartment was, as Lt. Gilpin testified, the fact that a few shower-curtain rings had been pulled down as if "somebody grabbed [the shower curtain and] gave it a yank." Therefore, according to Gilpin, "it didn't look like it was a violent [yank], all-the-way ripped down."

Even though the plaintiff insisted that her attacker hit her multiple times with his fists and with the pitcher from a kitchen blender during the course of the assault, defendant Kimberly Klare, who also responded to the scene, saw no physical evidence that Lilly had been struck,

other than a bruise on the right side of her face. Defendant Gilpin corroborated that observation, noting that Lilly had a bruise on her upper right cheek when he first saw her in her apartment.

Lilly eventually was transported to a local hospital, where she underwent a physical examination. Included in that examination were swabs of the plaintiff's vagina and her external genitals, both of which indicated the presence of semen. At the hospital, however, Lilly mentioned to Detective Klare that she thought the assailant "probably was" wearing a condom, and that, in any event, he did not ejaculate inside of her, or as she put it, "He did not have a happy ending."[1] Lilly further stated to Klare that, when she first regained consciousness, she realized that her attacker was "playing inside of me with a plastic utensil" and "checking out my orifice."

Detective Klare also spoke with Lilly's mother and stepfather at the hospital the night of the incident. According to the report Klare later filed, she explained to the parents that "there were some concerns with the account of events," and she asked them whether they thought Lilly could have fabricated the rape claim. Klare noted that "[t]hey seemed to believe it could be possible and appeared to agree that some of the details did not make sense." In their depositions given almost three years later, however, both parents were adamant that they believed the account offered by their daughter.

Twelve days after the incident, Klare again spoke in person with Lilly and reviewed the events of July 9. Prior to the conclusion of the meeting, however, Lilly became nervous and abruptly ended the interview, ostensibly to attend to her father, who was, she claimed, in some sort of unidentified pain. According to Klare's report, Lilly promised to speak with Klare again and also said that she "would speak to her boyfriend 'Eddie' about providing a control DNA

---

[1] During her deposition conducted two years after the alleged attack, Lilly testified that she could not determine whether the attacker wore a condom or whether he ejaculated either inside or outside of her vagina that day.

sample," in light of the fact that Lilly and Eddie had engaged in consensual intercourse the morning of the incident and that semen was present on the vaginal and exterior-genital swabs taken from the plaintiff at the hospital.

Approximately two weeks later, on August 3, 2010, Lilly contacted Klare by phone to attempt to schedule the follow-up interview and, for the first time, mentioned to the detective that she had changed her name legally to Charlie Jean Lilly "for anonymity purposes." In fact, however, Wood actually had petitioned to change her name to Lilly on June 30, 2010, and the request had been granted by court order on July 2, 2010, a full week *prior to* the attack from which Lilly claimed to be seeking anonymity.

Despite her promises to meet with Klare again and to have her boyfriend provide a semen sample, and despite confirming appointments with Klare on multiple occasions, Lilly neither kept her appointments nor provided the police with a sample of "Eddie's" semen to compare with bodily fluids recovered during administration of the rape-kit. In light of Lilly's evasions, Klare's own review of the evidence, and conversations with Lieutenant Gilpin, Klare began to believe that Lilly fabricated the rape allegation. As stated in Klare's offense report:

> First there was an issue with how [Lilly] had been able to call 911. She had given conflicting statements on how she had obtained and dialed 911. . . . The investigators were also concerned with the fact that all doors to the apartment were locked from the inside, and the initial responding officer had to force entry into [her] patio door.

> [Lilly] had been bound with torn pieces of sheet that had been her property. Upon observation of the knots and fashion her wrists and ankles were tied, it was Det. Klare's opinion that she could have tied herself up in this manner. Her left ankle was the only knot that appeared to be tied tightly. The sheet around her right foot/ankle was only looped and was not observed at any time to have been secure. [Lilly's] right wrist was tied in a very large knot. However, the tie to her left wrist was tied around her wrist and looped around her neck. Det. Klare believes that [she] first tied her left wrist and left length in the sheet, so that she would be able to make the knot on her right wrist. With the amount of length left in the sheet on her left wrist, she would have been able to loop it around her head/neck

before lying down. The pillow under her head was not disturbed at all, and was centered under her head.

[Lilly] had demonstrated at different times a couple of ways she was able to dial the phone. On one occasion, while at the hospital she indicated her wrists were bound together in one knot and she had gotten her left hand free. In a previous statement, [Lilly] had articulated that once she worked the phone into her left hand from under the pillow she was able to hold the phone out in front of her and dial the phone with her right hand. However, at no point in time did [she] make an attempt to free herself or remove the trash bag from her head. . . .

Det. Klare and Lt. Gilpin both noted the day of the report that nothing was wet. [Lilly] had reported that she was in the shower at the time she was knocked unconscious. However, the shower was not running, there was no water found to be in the shower head, and the sheets around [Lilly] were not wet. The only moisture found on [her] was sweat around her hair line where the bag had been over her head. This only raises suspicion, because at one point [Lilly] had stated she had gotten her hair wet first while in the shower, and later changed that statement stating she had not gotten her hair wet at all.

Also, in the bathroom it was noted that a towel was folded neatly over the tub wall. This was not consistent at all with [Lilly's] account of a struggle and falling out of the tub. There was no water noted on the floor of the bathroom either.

Klare also was informed by Lt. Gilpin that he had received an unsolicited phone call from Darrin Wood, Lilly's ex-husband. Despite not having spoken with Lilly about the alleged rape, Darrin Wood stated to Gilpin, "I bet [she said] the rapist could not get an erection." When asked why he would suggest that his ex-wife would make such a comment, Wood claimed, "That's her. That's exactly what she would say. . . . I have no idea if she said it or not, but I guarantee you she did." Wood insisted that the plaintiff is a chronic liar, even having gone so far as to tell people she was pregnant, despite having had a total hysterectomy. Furthermore, Wood claimed that when speaking to Lilly the day prior to the alleged attack, Lilly mentioned "that she's going to do anything she can to get out of her lease at the apartment and get out of her job at University Hospital."

Eventually, Klare presented her concerns to an assistant prosecutor who drafted a warrant for Lilly's arrest. The warrant was signed by a county judge, and Lilly was arrested on August 18, 2010, for falsely reporting an incident on July 9, 2010, in violation of Kentucky Revised Statute § 519.040. On September 30, 2010, Klare informed the Kentucky State Police Laboratory that an analysis of the rape kit evidence previously collected from Lilly need not be conducted because charges had been filed against Lilly for making a false report.

Despite the evidence of fabrication marshalled by the police, the state prosecutor later moved for dismissal of the charges without prejudice after "acknowledging currently there is some difficulty with meeting [the state's] burden of proof." The state court granted that request, and Lilly responded by filing this suit.

In her complaint, the plaintiff named numerous defendants, and raised federal claims of unlawful arrest, unlawful detention and imprisonment, and refusing or neglecting to prevent harassment of the plaintiff, as well as state-law claims of false arrest/false imprisonment, assault, battery, abuse of process, malicious prosecution, intentional infliction of emotional distress, negligent infliction of emotional distress, defamation, negligence, and gross negligence. After extensive discovery, the defendants moved for summary judgment. The district court concluded that Lilly had conceded her claims against all defendants except Gilpin and Klare. The court then determined that "undisputed facts were at least sufficient for a reasonable officer in Defendants' position to believe there was probable cause" to arrest Lilly for the charged offense. Furthermore, the district court ruled that Gilpin and Klare were entitled to qualified immunity from suit "because, even if probable cause does not exist, the facts were sufficient that a reasonable officer, in the Defendant officers' position, would not know he was violating Plaintiff's clearly established constitutional rights." In light of the dismissal of all federal claims

against the defendants, the district court exercised its discretion to dismiss the remaining state-law claims without prejudice.

## DISCUSSION

**Probable Cause to Arrest**

We review *de novo* the grant of summary judgment by a district court. *See Dodd v. Donahoe*, 715 F.3d 151, 155 (6th Cir. 2013). Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists only when, assuming the truth of the non-moving party's evidence and construing all inferences from that evidence in the light most favorable to the non-moving party, there is sufficient evidence for a trier of fact to find for that party. *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006). A non-moving party cannot withstand summary judgment, however, by introduction of a "mere scintilla" of evidence in its favor. *Id.*

Pursuant to the provisions of Kentucky Revised Statute § 519.040(1)(b), "[a] person is guilty of falsely reporting an incident when he . . . [r]eports to law enforcement authorities an offense or incident within their official concern knowing that it did not occur." The parties to this litigation do not, and indeed cannot, dispute that Lilly reported to law enforcement authorities an "incident within their official concern." The relevant issue on appeal, therefore, is whether the defendants had probable cause to believe that Lilly knew that the rape actually did not occur.

"[F]ederal law dictates whether probable cause existed for an arrest." *Kennedy v. City of Villa Hills*, 635 F.3d 210, 215 (6th Cir. 2011). As we recently recognized in *Kinlin v. Kline*, "Whether probable cause exists in a particular situation . . . is often difficult to determine"

because the concept "deals with probabilities and depends on the totality of the circumstances." 749 F.3d 573, 577-78 (6th Cir. 2014) (citing *Illinois v. Gates*, 462 U.S. 213, 232 (1983); *Brinegar v. United States*, 338 U.S. 160, 175 (1949)). At its essence, however, a determination of probable cause to arrest depends simply on "whether, at the moment the arrest was made, . . . the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [arrestee] had committed . . . an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964). "Probable cause is defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *United States v. Ferguson*, 8 F.3d 385, 392 (6th Cir. 1993) (*en banc*) (internal quotation marks and citation omitted). Moreover, in evaluating the legitimacy of a probable-cause determination, "[w]e consider only the information possessed by the arresting officer at the time of the arrest." *Harris v. Bornhorst*, 513 F.3d 503, 511 (6th Cir. 2008) (citations omitted).

Despite a natural caution to refrain from blaming (and incriminating) a person alleging a sexual assault, our examination of the totality of the circumstances in this case inexorably leads to the conclusion that it was not unreasonable for Gilpin and Klare to believe that Lilly falsely reported to the police that she had been raped in her apartment. They had before them statements and evidence that clearly offered much more than mere suspicion that the rape claim was fabricated. Moreover, Lilly's ex-husband voluntarily contacted the police and confirmed their initial impressions that the plaintiff might well be lying about the events of July 9, 2010. Indeed, Darrin Wood predicted that Lilly would tell them that the attacker was unable to obtain an erection because "[t]hat's her. That's exactly what she would say." In fact, Lilly did claim that

the person who allegedly assaulted her did not ejaculate or, in her words, "have a happy ending," and that she saw and heard him masturbating.

Pertinent to the officers' probable-cause determination was the incongruity between Lilly's description of the attack and the physical evidence observed by the defendants upon entering the apartment. It is true that Klare mentioned in her report that the investigators were concerned that both doors were locked from the inside of the apartment and that one of the first officers to arrive on the scene was forced to kick open the balcony door. As Lilly argues, however, other evidence indicates that the back door had a typical handle lock and that an intruder, for no apparent reason, could have pulled the locked door shut behind him as he exited the apartment. Thus, the fact that Lilly was confined within a locked apartment does not necessarily cast doubt upon her account of the pertinent events.

Nonetheless, other observations by the officers provided more substantial evidence of fabrication. Lilly steadfastly claimed that she was in the shower when she was first attacked, and initially, she insisted that she had been in the shower for approximately seven minutes before being hit in the head and face with the pitcher from a blender. After being so battered, the plaintiff said that she grabbed the shower curtain and leaned on it with all her weight prior to losing consciousness and being dragged to her bed. The physical condition of the apartment's bathroom belies any such confrontation. Not only were the shower walls and shower head completely dry, but the damage to the shower curtain was so minimal that Gilpin asserted that it could have been caused by one simple tug on the curtain. Of even greater importance in the officers' decision-making process was the fact that a perfectly dry towel remained neatly folded over the side of the bathtub. Had Lilly been showering in that tub for even a fraction of the time she claimed to have been, the towel would likely have been completely soaked. Furthermore,

had Lilly struggled with her attacker as she claimed and then been dragged out of the tub unconscious, the towel would not have remained as undisturbed as it was. Additionally, the floor of the bathroom had no wet areas, and the bed to which the victim was dragged also showed no signs of dampness.

Lilly insisted that she had been bound with strips of bed linen to the four corners of the bed. Nevertheless, the officers who arrived at the scene noticed that only the plaintiff's left leg was tied securely by the sheets. The sheets around her right leg and her two arms were loosely looped over those extremities such that a person of Lilly's age and size easily should have been able to extricate herself from the "bindings" prior to the arrival of the police. Damningly, even though Lilly apparently was able to free one arm enough to retrieve her phone from under the pillow, remove the washcloth from her mouth, and dial 911, she still had the plastic garbage bag over her head when the officers came on the scene. Indeed, they commented that when they arrived in the apartment, the bag was covering her head and face, even though she could have removed it easily. Lilly herself, during her 911 call, even apologized to the dispatcher for being difficult to understand over the phone because she had plastic over her face.

Additional considerations that helped form the defendants' opinion that Lilly had not been raped as she reported included the fact that she initially stated to Klare that she had changed her name legally from Leslie Sullivan Wood to Charlie Jean Lilly out of fear that her attacker would find her and assault her again. In fact, however, Lilly had obtained the name change a full week *prior to* the alleged attack. Also, Klare placed importance on the fact that Lilly continually canceled appointments to meet with the police who were, at that time, still ostensibly seeking information and assistance in order to capture the perpetrator of the attack, assault, and rape. Klare also deemed it unusual that Lilly did not help the police obtain a sample of the plaintiff's

boyfriend's semen so that forensic analysis could determine whether the traces of semen found on vaginal and exterior-genital swabs could be traced to the attacker, rather than to the boyfriend with whom Lilly admitted having consensual intercourse the morning of the incident.

Neither singularly nor collectively do these observations and evidence prove definitively that Lilly fabricated the claim that she had been attacked and raped in her apartment on July 9, 2010. Without question, however, the facts provide *a reasonable ground* for believing Lilly was guilty of the crime with which she was charged. Again, probable-cause determinations deal only with probabilities, and the facts and circumstances of which the defendant officers in this case had knowledge "were sufficient to warrant a prudent man in believing that [Lilly] had committed or was committing an offense." *Beck*, 379 U.S. at 91. Because Gilpin and Klare had probable cause to arrest Lilly for falsely reporting an incident, the district court did not err in granting summary judgment to the defendants on Lilly's claims of unlawful arrest and detainment.

**Qualified Immunity from Suit**

The district court concluded that even if the defendants did not have probable cause to arrest Lilly, they should be protected from liability in this case by principles of qualified immunity. The doctrine of qualified immunity developed in order to provide protection from civil liability under 42 U.S.C. § 1983 for government officials in the performance of discretionary duties. However, such protection is available only if the officials' "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Consequently, in order to determine whether any defendant is shielded by qualified immunity, "we apply the two-prong *Saucier* test and inquire (1) whether the officer violated a constitutional right and (2) if so, whether that constitutional right was clearly established such that a 'reasonable official would

understand that what he is doing violates that right.'" *Simmonds v. Genesee Cnty.*, 682 F.3d 438, 443-44 (6th Cir. 2012) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (citation and internal quotation marks omitted), *abrogated in part by Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). "A court of appeals may exercise its discretion to decide which prong of the test to address first in light of the circumstances of the case." *Bishop v. Hackel*, 636 F.3d 757, 765 (6th Cir. 2011) (citing *Pearson*, 555 U.S. at 236).

The Fourth Amendment to the United States Constitution states clearly that "no Warrants shall issue, but upon probable cause." The law thus is, and long has been, well-established that an individual cannot be arrested legally in the absence of a probable-cause determination. However, because defendants Gilpin and Klare *did* have the probable cause necessary to arrest Lilly for falsely reporting an incident, there is no need for further analysis of the officers' entitlement to a defense of qualified immunity. Absent proof of a constitutional violation, the defendants need not rely upon qualified-immunity principles to escape liability in this case.

**Supplemental Jurisdiction Over Plaintiff's State-Law Claims**

Pursuant to the provisions of 28 U.S.C. § 1367(a), federal district courts have supplemental jurisdiction "over all other claims that are so related to claims [over which the courts have original jurisdiction] that they form part of the same case or controversy under Article III of the United States Constitution." In this case, the plaintiff raised numerous state-law causes of action arising from the same operative facts as her federal constitutional claims. But because the district court dismissed those federal claims, it was within its discretion to decline to exercise its supplemental jurisdiction as well. *See Bennett v. CMH Homes, Inc.*, 770 F.3d 511, 516 (6th Cir. 2014) (stating that following dismissal of federal claims, "the district court in its discretion may properly choose whether to exercise § 1367(a) jurisdiction over the supplemental

state-law claims" (quoting *Orton v. Johnny's Lunch Franchise, LLC*, 668 F.3d 843, 850 (6th Cir. 2012))). The district court thus did not err in dismissing Lilly's state-law claims without prejudice.

## CONCLUSION

For the reasons set out above, we conclude that the district court properly granted summary judgment to the defendants on Lilly's federal claims and appropriately exercised its discretion to decline to assert jurisdiction over Lilly's state-law tort claims. We therefore AFFIRM the judgment of the district court.